**WARNER–LAMBERT COMPANY and Parke Davis & Co. Limited, Plaintiffs,**

v.

**NORTHSIDE ASSOCIATES, INC. and Quality King Distributors, Inc., Defendants.**

No. 95 Civ. 9157 (SAS).

United States District Court, S.D. New York.

Jan. 17, 1996.

Order Supplementing and Clarifying Decision Feb. 8, 1996.

John O'Donnell, Morgan, Lewis & Bockius LLP, New York City, for plaintiff.

Dennis M. Apfel, Miller & Apfel, Deer Park, New York, and John B. Rosenquest, III, Edwards & Angell, Providence, RI, for defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

#### I. Introduction

Plaintiffs (collectively, "Warner–Lambert") manufacture and distribute over-the-counter drugs, including HALLS brand cough drops and HALLS brand cough suppressant tablets. Plaintiffs' Memorandum at 2–3. Plaintiffs own three registered trademarks for HALLS. *Id.* at 3. Defendants are wholesale distributors of over-the-counter drugs and health and beauty products. *Id.* Plaintiffs contend that Defendants "knowingly sold, and continue to sell, products bearing Warner–Lambert trademarks with knowledge that such products are stale and do not comply with the quality control standards of" Warner–Lambert. *Id.* at 2. According to Plaintiffs, Defendants sell HALLS to their retailer customers in cartons and shipping trays that do not bear Warner–Lambert's freshness date [1] or manufacturing lot codes.

---

1. The language of these dates is "best before end of," followed by a named month and year. Defendants' Memorandum at 4; Plaintiffs' Reply Mem. at 3.

*Id.* at 5–6. Warner–Lambert does not dispute, however, that the product is sold to consumers in its original packaging (individual bags). Warner–Lambert affixes the freshness date to the shipping containers that it sells to wholesalers and retailers. Pl. Reply Mem. at 3. On October 25, 1995, Warner–Lambert sued Defendants under the Lanham Act, New York state trademark laws, and New York common law. On October 26, this Court granted a temporary restraining order that enjoined Defendants from continuing to sell HALLS brand products in cartons not bearing Warner–Lambert freshness dates.

Plaintiffs now seek a preliminary injunction enjoining Defendants from the following: selling HALLS past Warner–Lambert's freshness date; selling HALLS that have been repackaged or relabeled in a manner that omits the freshness date and lot code; selling HALLS that have been repackaged in a way that combines products from different manufacturing lots into a single container; disposing of any HALLS (including the packaging and marks thereon) that have been relabeled, repackaged or will shortly be past their freshness date; disposing of any sales, marketing or promotional materials that were distributed (or prepared for distribution) to customers and relate to HALLS products; and disposing of documents that relate to purchases or sales of HALLS products.

## II. *Standard*

■ In order to obtain a preliminary injunction in this Circuit, the applicant must demonstrate irreparable harm, and either (1) a likelihood of success on the merits of its case, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in its favor. *Polymer Technology Corp. v. Mimran*, 37 F.3d 74 (2d Cir.1994) (citing *Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314–15 (2d Cir. 1982)). Irreparable injury means "injury for which a monetary award cannot be adequate compensation." *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917 (2d Cir.1986) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). Consequently, "where money damages are adequate compensation a preliminary injunction should not issue." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990). A preliminary injunction is an extraordinary remedy, and one that should not be granted as a routine matter. Thus a party seeking such relief must show a *likelihood* of irreparable injury, not a *possibility* of irreparable injury. "[L]ikelihood sets, of course, a higher standard than possibility." *Id.* at 79–80.

■ However, if a plaintiff can show that its claim of trademark infringement is likely to succeed, then irreparable harm is presumed. "In the preliminary injunction context, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm." *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir.1982), *cited in Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987). Therefore, the issue here is whether Warner–Lambert has demonstrated a likelihood of success on the merits.

## III. *Discussion of the Merits*

### A. *Prevailing on a Trademark Infringement Claim Regarding Quality Control Procedures*

■ The Second Circuit has held that no action for trademark infringement will "arise where the goods being sold are genuine goods bearing a true mark." *Polymer*, 37 F.3d at 78. Goods are not considered genuine if they "do not meet the trademark owner's quality control standards," and the sale of such goods constitutes trademark infringement. *Id.* Furthermore, "[f]or this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir.1986). However, in applying this standard, the *Polymer* court examined the facts before it and decided, for several reasons, that no trademark infringement had occurred.

In *Polymer*, the plaintiff was a manufacturer of contact lens solutions. In addition

to selling solutions to the retail market, Polymer sold solutions to professional eye-care practitioners. The professional solutions did "not always contain the same information on their outer packaging as the retail solutions, nor [did] they always contain [a] tamper-evident seal." *Id.* at 77. The defendant in *Polymer* admitted to obtaining "Polymer's professional solutions from Polymer's authorized distributors and then resell[ing] them to wholesalers and retail drug stores." *Id.* As in the instant case, the plaintiff claimed that the defendant violated its trademark rights by selling its products to retailers even though the products did not meet the plaintiff's quality control standards. *Id.* Polymer contended that the defendant violated the quality control procedures in three ways: by selling kits of solutions that were mislabeled; by selling kits without tamper-evident seals; and by selling solutions individually after breaking up the kits. *Id.*

The court ruled against Polymer with respect to each alleged violation. First, the court found that Polymer itself had sold in the retail market a product bearing "an outside label with less information than that included on the outside labels on the professional kits." *Id.* at 79. Because Polymer could not prove that the defendant's actions violated the quality control procedures followed by Polymer itself, Polymer could not prevail on its trademark infringement claim for improper labeling. *Id.* Second, the court found that even if the defendant distributed some of Polymer's products without tamper-evident seals, there was no evidence that Polymer itself had "procedures in place to prevent its non-sealed kits from reaching the retail public." *Id.* Therefore, Polymer could not "now claim that its trademark was violated because [the defendant] allowed such product to reach that market." *Id.* Finally, the circuit court upheld the district court's finding that there was insufficient evidence that the defendant had broken down Polymer's kits and sold the solutions individually. *Id.* at 79–80. "In sum, Polymer ha[d] failed to prove that the district court abused its discretion in failing to accept Polymer's theory of trademark infringement based on [defendant's] alleged circumvention of Polymer's quality control efforts." *Id.* at 80.

Thus, in accordance with *Polymer*, it is first necessary to determine what Warner–Lambert's quality control procedures are, and then whether those procedures are pretextual. An evidentiary hearing was held on December 18 and 26, 1995.

**B.  Evidence of Warner–Lambert's Quality Control Procedures**

**1.  Description of Warner–Lambert's Quality Control Procedures**

**a.  Testing**

Joseph Hoholick is the Senior Manager for Product Development at Warner–Lambert. Tr. at 54. As such, he participates in stability studies of HALLS. He assesses both the chemical stability of HALLS and the stability of HALLS' physical properties (that is, the "consumer sensory experience factors"). Tr. at 57. The testing is performed by a group of expert scientists at Warner–Lambert who hold degrees in food science or chemistry. Tr. at 62–63. Hoholick himself has a bachelor of science degree in chemistry. Tr. at 54.

Studies of menthol, the active ingredient of HALLS, revealed that menthol is quite stable. In study after study, menthol proved so stable, in fact, that the director of an analytical group in Warner–Lambert's research and development department recommended the elimination of formal stability testing of menthol. Tr. at 58–60; Pl.Ex. 1.

Studies of "consumer sensory experience factors," however, have produced different results. Such studies examine four attributes of HALLS: wrapper sticking (the extent to which the cough drop sticks to its wrapper; caused by moisture); graining (the extent to which a cough drop becomes soft and opaque; caused by changes in the physical state of corn syrup and sugar); cold flow (the extent to which a cough drop flows into the package that contains it); and taste. Tr. at 60–61. Tests of these attributes have shown that by 24 months after the date of manufacture, HALLS cough drops exhibit slight contact clarity (wrapper sticking to cough drop), surface clouding, and slight surface graining. Tr. at 64–66; Pl.Ex. 2, pp. 60, 100.

Generally, Warner–Lambert does not test HALLS after 24 months. Rather, Hoholick extrapolates from the data gathered between 0 and 24 months. He assumes that the product continues to look worse as it ages. Tr. at 85–87. However, in anticipation of this litigation, Hoholick and his colleagues tested a batch of HALLS that were between 27 and 30 months old. In that test, HALLS exhibited further graining, slight wrapper sticking, slight to moderate cold flow, color changes and occasional changes in taste. Tr. at 67–74; Pl.Ex. 3–4.

In calculating the shelf life of HALLS, Hoholick assumes that a consumer will use up a bag of HALLS (containing 30 drops) within six months. Tr. at 81. Hoholick therefore conceded that he "expect[s] the product to be of acceptable consumer quality at 30 months in normal storage conditions." Tr. at 84.

### b. *Shipping/Selling*

Marilyn Goller is the Senior Manager of Sales Administration for the American Chicle Group of Warner–Lambert. Tr. at 99. Goller testified extensively regarding Warner–Lambert's quality control procedures for HALLS cough drops. Her testimony establishes the following.

The shelf life of HALLS cough drops is 24 months. That number represents the length of time between the date of manufacture and the last date that Warner–Lambert would like the product sold to an end consumer. Tr. at 102; Pl.Ex. 5, p. XII–A (2 of 2). The purpose of this limit is for the consumer to buy the best quality HALLS product. Tr. at 102. Warner–Lambert sales representatives enforce the shelf life of HALLS by visiting stores and checking the freshness dates of HALLS in those stores. These representa-

tives issue credits to customers [2] holding HALLS products whose freshness date has passed and oversee the destruction of such products. Tr. at 119–122; Pl.Ex. 21 at 1063, 1066, 1068. Warner–Lambert supervises the destruction of outdated product to ensure that such product does not go back into the marketplace.[3] Tr. at 131.

Except in "very rare and specific situation[s]," Warner–Lambert's distribution centers do not ship HALLS more than 18 months after the date of manufacture. Tr. at 100, 116; Pl.Ex. 19, p. 286. Warner–Lambert initiated this policy in September 1993. Pl.Ex. 20. Product not distributed within 18 months of manufacture is destroyed. Tr. at 117. For an exception to the 18–month rule to apply, Goller must receive assurances from the retailer that the product will stay specifically in that retailer's area. Moreover, the retailer must sign an agreement to that effect, and at the end of 24 months, Warner–Lambert sends a salesperson to the retailer to retrieve any unsold product. Tr. at 117.

The training of Warner–Lambert's sales force addresses quality control. Sales representatives are taught that "freshness sells," that they should "rotate product," and how to administer Warner–Lambert's programs for returning outdated product. Tr. at 126. Moreover, Warner–Lambert considers quality control when evaluating its sales force, and the company has dismissed sales people for failing to keep up with quality control procedures. *Id.*

Goller also described Acker studies, which are another component of Warner–Lambert's quality control procedures. Acker is "an independent audit firm that ... determines the age of product on store shelves and submits

---

**2.** "Customers" are those who buy directly from Warner–Lambert; they are the only ones to whom Warner–Lambert issues credit for outdated merchandise. Tr. at 129. Others who buy HALLS must seek refunds from whoever sold them the product.

**3.** In some cases, customers send outdated product to a reclamation center, which is a warehouse repository for unsalable inventory. Tr. at 121. In order to get credit from Warner–Lambert, customers must return products at reclamation centers either to Warner–Lambert or to Damage Track, a company that Warner–Lambert

has hired to scan products in reclamation centers and supervise the destruction of outdated products. Tr. at 121, 128–29, 131–32; Pl.Ex. 25 at 279. From January 1992 through October 1995, Warner–Lambert destroyed or reimbursed approximately $5.1 million worth of HALLS products. Tr. at 133–34. In addition, between November 1993 and October 1995, Warner–Lambert spent an additional $575,555.69 issuing Gelco rapid drafts (a form of check) to reimburse customers for outdated HALLS products. Tr. at 134–35.

a report to [Warner–Lambert's] marketing department." Tr. at 139. For example, the most recent Acker study, dated May 1995, estimated that 4.4% of all HALLS products on store shelves were past their freshness date. Tr. at 169; Pl.Ex. 40, p. 2048.

However, a private investigator hired by Defendants turned up somewhat different results. On November 7, 1995, John Ahearn selected 18 stores in Suffolk County, representing nine different retailers. Tr. at 213, 216. Ahearn found that six of the 18 stores were selling HALLS cough drops that had been manufactured more than 24 months earlier. Tr. at 214.

### c. Information Contained on Packaging

Warner–Lambert ships HALLS cough drops in boxes containing 48 bags. The box is called a shipper. Inside the shipper, the 48 bags are divided into two display trays, each of which holds 24 bags. Tr. at 105. On the outside of the shipper is a lot code, which reflects the date of manufacture of the product inside the shipper. Tr. at 106. Each bag also bears a code that reflects the date of manufacture of the drops inside the bag. This is a closed code (not understandable to a lay person), but Warner–Lambert explains the code to retailers who ask what the code means. Tr. at 107–108. In 1993, Warner–Lambert promulgated a new policy known as "open coding." Pursuant to this policy, Warner–Lambert places an open (i.e. readable) code on shippers and display trays. This code reads "best before end of," followed by a named month and year. Tr. at 110; Pl.Ex. 14, 16.

The freshness information printed on the outside of the shipper is not intended for consumers, because the shipper is not part of the consumer packaging. Rather, the information on the outside of the shipper is intended for people who work in warehouses or in stores. Tr. at 176–77. The individual bags of HALLS are considered the consumer packaging. Tr. at 107–108. Lot code information on the outside of shippers makes product recall much easier. Warner–Lambert looks unfavorably upon shipping cartons that contain more than one lot code; if the bags within a shipper are of mixed lot codes, customers would have to examine the bags

one by one in order to determine which are being recalled. Tr. at 106–107.

### d. Lack of Contractual Provisions Prohibiting Sale of Out-of-Date Product

Warner–Lambert does not have a written policy prohibiting its customers from selling out-of-date HALLS. Tr. at 192–93. However, Warner–Lambert contends that if it learns of a customer that is selling HALLS past its freshness date, Warner–Lambert will either take legal action against that customer or will stop selling to that customer. Tr. at 192. According to Goller, Warner–Lambert does not impose contractual provisions on its customers forbidding such sales because it adheres to an industry standard by which no company imposes contractual provisions of that kind. Rather, Warner–Lambert maintains that it abides by an industry-wide ethic requiring manufacturers to take bad product off the market. Tr. at 135–36.

### 2. Does Warner–Lambert Follow Its Quality Control Procedures?

The only evidence of an instance in which Warner–Lambert did not follow all of its quality control procedures relates to a transaction between Warner–Lambert and Collegiate Marketing. In the fall of 1994, Warner–Lambert contracted with Collegiate to sell $4 million (retail sales value) worth of HALLS 30–count bags and Dentyne gum for $995,000. Tr. at 160, 167. The contract was for a sampling program—Collegiate would sell book bags at college campus stores during the fall term, and each book bag would contain one bag of HALLS cough drops. Tr. at 164. As part of this deal, Warner–Lambert sold Collegiate boxes as well as floor display stands. Floor display stands have window pockets that display bags of HALLS. The floor stands that Warner–Lambert sold to Collegiate contained multiple flavors and thus multiple lot codes, in contravention of Warner–Lambert's quality control procedures. Tr. at 161–62. However, Goller suggested that the multiple lot codes would not make recall difficult in this instance because whenever Warner–Lambert prepares a "special pack" as it did for Collegiate, Warner–

Lambert generates a master lot code number that reflects every unit lot code. Tr. at 162.

Although the boxes and floor stands sold to Collegiate contained lot codes and freshness dates, there was no freshness dating information on the bags of HALLS themselves. Tr. at 161, 164–65. According to Goller, there was no need to place freshness dates on the bags themselves because the contract with Collegiate required Collegiate to distribute all of the bags during the fall semester, and most of the bags had a freshness date of June 1995. Tr. at 164, 167. Finally, Goller testified that the age of the product that Warner–Lambert sold to Collegiate was a factor in Warner–Lambert's decision to sell that particular portion of its inventory to Collegiate as opposed to other portions of its inventory. Tr. at 167.[4]

### 3. Are Warner–Lambert's Quality Control Procedures Actually Intended to Deter Competition?

Several pieces of evidence suggest that Warner–Lambert's quality control procedures might be motivated in part by a desire to deter competition in addition to controlling quality. First, the instant litigation arose from a complaint by Eckerd (a retail drugstore chain) that it had bought HALLS cough drops that were beyond their freshness date. However, Warner–Lambert's initial concern regarding the Eckerd complaint was not with the age of the product Eckerd bought but with the price Eckerd paid for that product. Tr. at 156–58. By purchasing outside of Warner–Lambert's distribution channels, Eckerd was able to buy bags of HALLS for a price lower than Warner–Lambert offered. Id. This suggests that the case is not about selling HALLS in shippers and trays that do not disclose freshness dates

but rather about slowing the traffic in the diversion market.[5]

Further, as Defendants point out, some of Warner–Lambert's customers have an incentive not to return too much product to Warner–Lambert, even if the product is beyond its freshness date. Some discounts and allowances offered by Warner–Lambert are contingent upon a customer's returning less than one percent of its purchases to Warner–Lambert. Tr. at 196. However, Goller testified that this arrangement applies only to Warner–Lambert's telemarketing program, which represents a small percent of Warner–Lambert's business. Goller also suggested that this one-percent limit exists because product returns and credits for these customers are arranged over the phone without a Warner–Lambert representative being able to inspect the product that is to be returned. Tr. at 197.

Finally, if Warner–Lambert were serious about keeping bags of HALLS out of consumers' hands after 24 months from the date of manufacture, it would print a freshness date in readable form on the bag itself. Warner–Lambert proffers a business reason for not doing so: the freshness date will not fit on the stick form of HALLS, and Warner–Lambert seeks consistency among the various HALLS products. But the rationale of seeking consistency seems far less important than Warner–Lambert's professed desire to have consumers buy and consume the freshest HALLS possible. There is plenty of room on a HALLS bag or stick to print the phrase "EXP 9/96" (or whatever month and year mark the passing of the freshness date).

### C. Findings Regarding Warner–Lambert's Quality Control Procedures

I find that Warner–Lambert does maintain legitimate quality control procedures in an

---

**4.** The Court notes, however, that if the product sold to Collegiate had a freshness expiration date of June 1995, then the product was manufactured in June 1993. Therefore the product was 15 months old at the time of the sale to Collegiate, and the sale did not violate Warner–Lambert's policy against shipping HALLS past 18 months from the date of manufacture. Warner–Lambert's only violation of its quality control procedures in the Collegiate deal appears to be the mixing of lot codes within floor stands.

**5.** The need for such a market may be substantial. Goller testified that Warner–Lambert imposes a minimum order requirement of $2500 on its customers. Tr. at 178. If the order were to consist entirely of HALLS, a customer would be required to buy approximately 50 boxes of HALLS (with 48 bags per box). Id. at 178–79. Goller further testified that Warner–Lambert does not prevent its authorized wholesalers from filling orders as small as 12 bags. Id. at 179–180.

attempt to prevent retailers and wholesalers from buying HALLS cough drops that are beyond their freshness dates. The key components of these procedures, in my view, are Warner–Lambert's usual policy of not shipping past 18 months from the date of manufacture and Warner–Lambert's provisions for wholesalers and retailers to return outdated product for credit. The printing of the freshness date on the outside of the shippers and on the inner display trays are crucial to Warner–Lambert's efforts to maintain quality control. Warner–Lambert's deal with Collegiate does not alter my conclusion that Warner–Lambert adheres to its stated policy. The cough drops sold to Collegiate were still less than 18 months old, and the outer packaging contained freshness dates. This conforms to Goller's testimony that except in rare circumstances, Warner–Lambert does not ship HALLS cough drops that are more than 18 months old.

However, I find that Warner–Lambert makes no real attempt to ensure that consumers do not buy HALLS that are past their freshness dates. I find the results of the survey by Defendants' investigator particularly telling. While the evidence suggests that Warner–Lambert follows its own policy, that policy is not working. That is, consumers are able to buy HALLS that are past their freshness dates. While Warner–Lambert procedures encourage customers to monitor the freshness dates of HALLS and to return to Warner–Lambert for a refund or credit any cough drops for which the freshness date has passed, Warner–Lambert does not prohibit retailers from selling HALLS for which the freshness date has passed. Moreover, Warner–Lambert does not provide refunds or credit to purchasers of HALLS who bought the product outside Warner–Lambert's authorized chain of distribution. This suggests that Warner–Lambert is at least as interested in reducing traffic in the diversion market as it is in ensuring that consumers buy fresh HALLS. If Warner–Lambert really wanted to prevent sales of HALLS for which the freshness date has passed, it would impose contractual conditions on the wholesalers and retailers to whom it sells, it would issue credit for outdated product to any retailer or wholesaler holding such product, and it would print an expiration date directly on the HALLS bag, which is the consumer packaging.

## IV. Conclusion

Consequently, with respect to the sale of HALLS in shippers and display trays that do not bear a freshness date, Warner–Lambert has shown that it is likely to prevail on the merits of this case. Accordingly, the Court presumes irreparable harm and grants Plaintiffs' request for a preliminary injunction. Defendants are enjoined from shipping HALLS brand cough drops in packaging (shippers and trays) that omits the freshness date printed on all Warner–Lambert shipments. However, Plaintiffs' request to expand the scope of the temporary restraining order is denied. There is no principled reason to enjoin Defendants from *selling* HALLS brand cough drops for which the freshness date has passed, because Warner–Lambert itself does not prohibit such a practice.

SO ORDERED.

## MEMORANDUM OPINION AND ORDER

After the issuance of a preliminary injunction in this matter by the Court's Opinion and Order of January 17, 1996, both parties moved for additional relief.

## I. Request for Supplemental Order

Plaintiffs ("Warner–Lambert") correctly point out that the Court's Order issuing a preliminary injunction did not address Plaintiffs' request that Defendants ("Quality King") be enjoined from secreting or destroying evidence in this case. Plaintiffs' request for a supplemental order enjoining such activity is granted. Plaintiffs also request that the Court require Defendants to file with the Court and serve on Warner–Lambert a written report specifying how Defendants have complied with the injunction. The request is granted. An appropriate order follows.

## II. *Request for Injunction Pending Appeal*

Warner–Lambert is appealing this Court's partial denial of its motion for a preliminary injunction. Pending appeal, Plaintiffs seek an injunction enjoining Defendants from selling HALLS brand cough drops for which the freshness date has passed. Quality King does not dispute Plaintiffs' recitation of the standard for granting a stay or injunction pending appeal. Pl.Mem. at 3; Def.Mem. at 3. One prong of the four-part test requires the movant to "demonstrate[ ] 'a substantial possibility, although less than a likelihood, of success' on appeal." *Hirschfeld v. Board of Elections,* 984 F.2d 35, 39 (2d Cir.1993). For the reasons stated in the January 17 Opinion (which are the reasons that caused the Court twice to deny Plaintiffs the requested relief), I find that the Plaintiffs have not made such a showing. Their request for an injunction pending appeal is denied.

## III. *Request for Clarification of Existing Injunction*

The preliminary injunction enjoined Defendants "from shipping HALLS brand cough drops in packaging (shippers and trays) that omits the freshness date printed on all Warner–Lambert shipments." Opinion and Order of January 17, 1996 at 16. Defendants now ask whether they may ship in quantities smaller than 24–bag trays, and if so, whether they must mark the freshness date on the containers in which these smaller quantities are shipped.

Marilyn Goller, Senior Manager of Sales Administration for the American Chicle Group of Warner–Lambert, testified that Warner–Lambert allows its authorized wholesalers to sell HALLS cough drops in quantities less than 24–bag trays. Tr. at 180. She acknowledged that delivery from wholesalers to retailers of quantities less than 24 bags "neither necessitates nor makes sensible the use of the HALLS shipper or display tray." Tr. at 181.

On the one hand, Defendants should not be placed in a position worse than that of authorized wholesalers, who are allowed to sell small quantities of HALLS cough drops in packaging other than trays or shippers that bear Warner–Lambert's freshness date.

However, allowing Defendants to do the same would defeat the purpose of the preliminary injunction, which is to make the Warner–Lambert freshness date known to Defendants' customers. For the purpose of this injunction only, Defendants may sell HALLS cough drops in shipments of less than 24 bags (thus obviating the need for a tray or shipper) as follows:

a) If the cough drops to be shipped are at or past Warner–Lambert's freshness date (that is, if the cough drops are 24 months old or older), then Defendants must notify the customer of Warner–Lambert's freshness date by marking the date on the shipping packaging in letters large enough to be seen and read by the customer.

b) If the cough drops to be shipped have not reached the Warner–Lambert freshness date (that is, if they are less than 24 months old), then Defendants may ship them without marking the freshness date on the packaging.

Defendants are reminded that these conditions apply only to shipments of less than 24 bags. Any HALLS brand cough drops shipped in shippers and trays must bear the freshness date that is printed on all Warner–Lambert shipments.

## IV. *Conclusion*

Upon consideration of Plaintiffs' Motion for a Supplemental Preliminary Injunction Order and Defendants' Response thereto, it is hereby

**ORDERED** that Defendants, and each of them, and their officers, directors, employees, agents, assigns, servants, and any other person in active concert or participation with any of them, are hereby preliminarily enjoined, during the pendency of this action, from:

1. Selling, offering for sale, distributing, or transferring any HALLS brand cough drops in shippers (capable of holding 48 bags of cough drops) and trays (capable of holding 24 bags of cough drops) that omit the prominent display of the manufacturer's freshness ("best before end of") date;

2. Selling, offering for sale, distributing, or transferring any HALLS brand cough

drops that are 24 months old or older in shipments of less than 24 bags in shipping packaging that omits the prominent display of the manufacturer's freshness ("best before end of") date;

3. Disposing of or secreting, transferring, concealing, moving, or otherwise altering in any way any sales, marketing, or promotional materials, circulars, pamphlets, inventory listings, or other written material distributed or prepared for distribution to potential or actual customers or purchasers of or from Defendants, or either of them, that relate or refer directly or indirectly to any HALLS brand products;

4. Disposing of or secreting, transferring, concealing, moving, or otherwise altering any and all documents, including but not limited to invoices, bills, bills of lading, telephone records, receipts, computer records, correspondence, bank statements, cancelled checks, deposit slips, purchase forms, shipping documents, books, ledgers, photographs, films, audio or video tape recordings, or other forms of paper, magnetic, or other media that relate to or reflect purchases or sales of HALLS brand products by or to Defendants, or either of them; and it is further

**ORDERED** that Defendants, and each of them, shall file with the Court and serve on Plaintiff Warner–Lambert Company within 30 days after the service on Defendants of this Order, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with this Order and with the Court's Order of January 17, 1996.