**CHRISTOPHER NORMAN CHOCOLATES, LTD., Plaintiff,**

v.

**SCHOKINAG CHOCOLATES NORTH AMERICA, INC., Defendant.**

**No. 03 CIV. 2428(VM).**

United States District Court, S.D. New York.

July 10, 2003.

---

Allan C. Samuels, Reed Smith LLP, New York City, for Christopher Norman Chocolates, Ltd., plaintiff.

Robert Alpert, Yuval H. Marcus, Ladas & Parry, New York City, Joseph J. Villapol, Ladas & Parry, New York City, for Schokinag Chocolates North America, Inc., defendant.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Christopher Norman Chocolates, Ltd. ("CNC") commenced this action on April 8, 2003 against defendant Schokinag Chocolates North America, Inc. ("Schokinag") asserting violations of sections 32, 43(a) and 43(c) of the Lanham Act (the "Lanham Act"), as amended, 15 U.S.C. §§ 1114, 1125(a), and 1125(c) (2003), respectively, and related state law claims, including unfair competition and breach of contract. Now before the Court is CNC's motion for preliminary injunctive relief. CNC seeks an order preventing Schokinag during the pendency of this action from promoting, advertising, market-

ing, or selling chocolate products bearing CNC's trademark. A hearing on the matter was held before the Court on June 20, 2003. For the reasons set forth below, CNC's application for a preliminary injunction is DENIED.

### I. BACKGROUND [1]

CNC, based in New York, is a chocolate confectioner. It produces lines of chocolate truffles, gift boxes, and other handmade chocolate specialties for sale through so-called "high-end" or "upscale" retailers in North America. Schokinag, based in California and an affiliate or subsidiary of a company founded in Germany, sells chocolate in bulk to makers of chocolate products throughout the United States. On July 10, 2000, following discussions that began in 1998, the parties executed a Joint Development/Marketing Agreement (the "Joint Venture Agreement"), attached as Ex. 6 to Down Decl., in which they agreed to cooperatively produce and market a line of chocolate products primarily targeting the home chef market. The Joint Venture Agreement provided for a line of one-pound baking chocolate bars and allowed for the possibility of expanding the cooperative venture to include other products as well. In addition to the chocolate bars, three other products were developed: a "baking chunks" or "chocolate chunks" product, a "cocoa powder" product, and a "drinking chocolate" product.

The parties produced, advertised, and marketed these items in various magazines and newspapers and at various select retailers. Both parties' trademarks appeared on the packaging for each product

---

1. The factual recitation appearing above is derived primarily from the Declaration Of John Down In Support Of Plaintiff's Order To Show Cause For Preliminary Injunction dated May 20, 2003 ("Down Decl."); Declaration Of Warren H. Kim dated May 30, 2003 ("Kim Decl."); Declaration of Brian Warkentin dated May 29, 2003; and the Supplemental Declaration Of John Down dated June 9, 2003 ("Down Suppl. Decl."). Additional citations to the record appear below as necessary.

line. The products were also promoted at several trade shows, including the Fancy Food Shows held in San Francisco in January 2001 and 2001, in Chicago in March 2001 and 2002, and in New York in July 2001 and 2002.

In mid–2002, the parties began to disagree on several matters, including the packaging details and certain recipe inserts for the various co-branded products. Numerous letters were exchanged between them addressing these matters. In a response dated July 11, 2002, attached as Ex. 9 to Down Decl., Shokinag offered to discuss the possibility of terminating the Joint Venture Agreement if CNC so desired. In a letter dated September 9, 2002, attached as Ex. 11 to Down Decl., CNC directed Schokinag to cease and desist use of CNC's trademark in connection with the co-branded products developed pursuant to the Joint Venture Agreement, and proposed plans and further discussions for terminating the Joint Venture Agreement. Two similar letters followed from CNC dated October 11, 2002 and January 17, 2003, respectively, attached as Exs. 12 and 13 to Down Decl.

To date, the parties have been unable to agree on terms for winding up their joint venture, and the co-branded products developed and marketed pursuant to the Joint Venture Agreement continue to be sold by Shokinag. Additional factual details are introduced and discussed as necessary below.

## II. DISCUSSION

### A. STANDARD FOR PRELIMINARY INJUNCTION

■ The standard for granting an application for a preliminary injunction is well settled. In order to prevail on such a motion, a party must establish irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in its favor. See Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir.2002).

### B. IRREPARABLE HARM

■ The Court will begin its analysis by addressing the requisite showing of irreparable harm. At the outset, the Court recognizes that irreparable harm is presumed in a trademark infringement action where a sufficient showing of confusion has been made. See Federal Express Corp. v. Federal Espresso, Inc., 201 F.3d 168, 174 (2d Cir.2000); Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2d Cir.1988). In this case, however, even assuming consumer confusion is likely, this presumption is not squarely applicable to—and, to the extent that it is applicable, is rebutted by—the facts presented because the parties are neither competitors in the marketplace nor participants in a trademark licensing agreement. Rather, the present dispute arises out of what is more properly understood to be a joint venture arrangement. As CNC acknowledges in its Memorandum In Support Of Plaintiffs' Order To Show Cause For Preliminary Injunction (undated) ("CNC Br.") at 3, "CNC and Schokinag decided to *work together in producing and co-branding* a line of home baking products." (emphasis added.) The parties agreement itself is entitled "Joint Development/Marketing Agreement," and the very first sentence therein states that: "Schokinag Chocolate North America, Inc. and Christopher Norman Chocolates, Ltd. will *co-develop* a line of premium chocolate bars ...." (emphasis added.) Both parties' trademarks appear on the items at issue produced pursuant to their joint venture. The Joint Venture Agreement allocates joint responsibility to both parties as regards such matters as publicity, "aesthetic issues," and product promotion. It allocates primary responsibility to CNC as regards packaging design but provides for

Schokinag's final approval of "all final designs and copy." Finally, the Joint Venture Agreement provides for an equal profit sharing arrangement based on per unit sales. (*See* Joint Venture Agreement, ¶¶ 1, 2, 4, 6.)

■ In consequence, the dispute in this case is not one in which the defendant's trademark or dress is confusingly similar to that of the plaintiff, nor is this a case where the defendant's products bear the plaintiff's trademark pursuant to a license that has clearly expired. Rather, here, according to CNC, the continued association of CNC's trademark with *co-developed and co-branded* items bearing the trademarks of both parties, now that the joint venture has been terminated, will harm CNC. This association may confuse the public into believing that the co-branded items are *still* marketed in part by CNC and thus harm CNC in the event the quality of the products is inferior or substandard. Alternatively, Schokinag's packaging may harm CNC's trademark in the nature of something akin to tarnishment. The Court will address these potential bases for irreparable harm in turn.

### 1. *Quality and Control*

■ The Second Circuit has instructed that claims of irreparable harm sufficient to support injunctive relief must be real, actual, and imminent, not remote or speculative. *See, e.g., Kamerling,* 295 F.3d at 214; *Levin v. Harleston,* 966 F.2d 85, 90 (2d Cir.1992). The Circuit Court further declared that

> irreparable harm exists in a trademark case when the party seeking the preliminary injunction shows that it will lose control over the reputation of its trademark pending trial. . . . If a trademark owner allows licensees to depart from its quality [or other] standards, the public will be misled, and the trademark will

cease to have utility as an informational device.

*Church of Scientology Int'l v. The Elmira Mission of the Church of Scientology,* 794 F.2d 38, 43 (2d Cir.1986) (citation omitted; internal quotation marks omitted).

CNC identifies certain alleged bases for breach of contract such as failure by Schokinag to properly advertise and distribute the co-branded products and to report sales figures. As pertains to matters affecting its trademark, however, CNC only identifies a dispute regarding a recipe insert and packaging details. But regardless of such disagreements, the parties essentially agree—more precisely, CNC has offered no evidence to dispute Schokinag's contention—that the co-branded products that are now on the market are being produced and packaged in the same way that they were produced and packaged prior to CNC's termination of the Joint Venture Agreement, which, at the very earliest, would appear to be as of September 9, 2002, when CNC sent Schokinag the first "cease and desist" letter insisting that Schokinag discontinue any further use of CNC's name. (*See* June 20, 2003 Hearing Transcript ("Tr.") at 8–11, 15, 23.) Additionally, Schokinag has represented to the Court that the items as presently packaged are no longer in production and that Schokinag is simply in the process of selling inventory. (*See, e.g., id.* at 27, 44.) Schokinag has further represented that, absent consent by CNC, it has no plans to broaden the retail distribution of the products beyond the category of so-called "upscale" retailers that sold the products prior to the termination of the Joint Venture Agreement, and, more particularly, has indicated that it has no plans unilaterally to distribute the items through so-called "discount" retailers. (*See, e.g., id.* at 41–42, 44–46.) By agreeing to and participating in the joint venture, CNC implicitly endorsed, approved of, or accept-

ed these production and marketing methods up to the time of the joint venture's termination.

This constancy in production, packaging, and distribution is sufficient to rebut the presumption of irreparable harm that would follow from a showing of likelihood of confusion because the presumption presupposes artificial products or a fictional association. Here, while the joint venture presumably has ended, the parties' dispute arises out of an actual contractual association between them to manufacture and sell genuine co-branded products. *See Am. Cyanamid Co. v. Campagna per le Farmacie in Italia S.P.A.,* 847 F.2d 53, 55 (2d Cir.1988) ("[C]onfusion as to *source or sponsorship* establishes ... irreparable harm." (citations omitted; emphasis added; internal quotations omitted)); *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1314 (2d Cir.1987) (same); *Standard & Poor's Corp., Inc. v. Commodity Exch., Inc.,* 683 F.2d 704, 708 (2d Cir.1982) (same); *Warner–Lambert Co. v. Northside Assocs., Inc.,* 922 F.Supp. 840, 842 (S.D.N.Y.1996) (same), *aff'd in part, rev'd on other grounds,* 86 F.3d 3, 6–7 (2d Cir.1996). As this Court has previously observed, when a dispute arises out of a joint venture, "the parties are not competitors, nor are there two similar competing products. Rather, the parties are fractured parts of the same enterprise, and the product at issue is the fruit of that enterprise.... [T]herefore, no presumption of irreparable harm arises." *Ableman v. Polinex Plastic Prods. Canada, Ltd.,* No. 92 Civ. 4112, 1992 WL 212471, at *3 (S.D.N.Y. Aug.26, 1992).

Because, under these circumstances, there is no showing or even any clear allegation of any loss of quality, and because there has not been nor can there be any demonstrable loss of product control given Schokinag's representations to CNC and the Court that it will proceed in accordance with the methods followed during the parties' joint venture, the Court further concludes that CNC has not demonstrated any imminent, actual harm. *See, e.g., Arthur Guinness & Sons PLC v. Sterling Publ'g Co.,* 732 F.2d 1095, 1099 (2d Cir.1984) (where plaintiff licensor's showing of inferior quality was insufficient, Second Circuit affirmed district court's finding that irreparable harm had not been established, noting: "[W]e cannot perceive how [the defendant licensee's] publication could irreparably have harmed its licensor unless the product was so inferior that it could severely injure [the plaintiff licensor's] reputation in the United States."); *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,* 155 F.Supp.2d 1, 43 (S.D.N.Y.2001) (where plaintiff claimed television series entitled "Mutant X" would "dilute the value of the 'X–Men' film franchise," the court found no irreparable harm where, among other things: "neither the nature nor quality of the alleged harm is precisely explained."); *see also Warner–Lambert Co. v. Northside Dev. Corp.,* 86 F.3d 3, 6 (2d Cir.1996)(in expanding the district court's preliminary injunction against the defendant wholesaler that had acquired and was selling stale bags of plaintiff manufacturer's cough drops, the Second Circuit recognized the importance of product quality and stated: "Distribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image. If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement." (citations omitted)); *Dunkin' Donuts Inc. v. Albireh Donuts, Inc.,* 96 F.Supp.2d 146, 149–50 (S.D.N.Y.2000) (where franchisee of the plaintiff violated plaintiff's health, sanitation, and safety standards, the court recognized the impor-

tance of product quality and concluded: "[T]he serving of inferior, non-conforming products under [plaintiff's] name could have a detrimental impact on [plaintiff's] name and goodwill, devalue [plaintiff's] trademark, and subject [plaintiff] to a loss of business and exposure to substantial tort liability. The courts have repeatedly held that such damage is not readily quantifiable and, thus, constitutes irreparable harm."). On a parallel point, the Court further notes that any public confusion regarding whether CNC is *still* involved in the creation of the co-branded products generates minimal, or even nominal, harm to purchasers because, on the record before the Court, it appears that, putting aside the parties' dispute concerning the recipe inserts and the degree of CNC's participation in certain product naming and marketing decisions, consumers are still receiving the same quality goods that they were receiving prior to the collapse of the parties' agreement.

The Court notes that the drinking chocolates, having been developed in and after November 2002, may not have been produced prior to the termination of the parties' contract. This issue is clouded by the dispute over the precise termination date of the parties' contract, given the timing and acceptance of certain payments made under the agreement and in light of asserted notice obligations and related processes, as well as the parties' debate over whether these putative requirements were satisfied by CNC and at what point. Nonetheless, Schokinag represents that the drinking chocolate packaging reflects the same packaging scheme as the bars. (Tr. at 25.) More importantly, CNC: (1) does not dispute this contention with any specificity, and makes no specific allegation that this packaging materially or qualitatively differed from the packaging designs utilized for the other co-branded products; (2) does not even include in its submissions any exhibits discernibly de-

picting the drinking chocolate packaging; and (3) does not allege that the drinking chocolate product itself was of substandard quality. Accordingly, the Court has been provided with no sufficient evidentiary record or reasonable basis to conclude that this product deserves any special consideration separate and apart from the other co-branded items that were clearly produced while the Joint Venture Agreement was in effect.

### 2. *Packaging and Inserts*

With respect to the second basis of asserted irreparable harm—that resulting from Schokinag's packaging and inserts—the Court notes that analysis of this matter is complicated by the fact that the exhibits the parties provided do not allow for a meaningful comparison between the packaging and appearance of the co-branded items as compared to the packaging and appearance of CNC's individual products. The pictures supplied are generally very small and include numerous items not well identified or otherwise discernible. More importantly, however, CNC has not specifically identified and explained any qualitative differences that might constitute a basis for such harm to its trademark, focusing instead on the existence of disagreements with Schokinag as to unspecified packaging details, (*see, e.g.,* CNC Br. at 5–6), and the presence of CNC's trademark on the packaging, (*see id.* at 7–8). Even with respect to the recipe inserts, CNC does not indicate how Schokinag altered the original structure, offering instead largely conclusory allegations that Schokinag "substantially altered it to create their own imitation recipe insert that cheapened and degraded the original versions." (*Id.* at 6.) Without such a particularized presentation of differences and their implications as regards the integrity and public perception of CNC's trademark, CNC has not met its burden of providing

the Court with a basis to sustain this alleged harm.

### 3. *Profits and Sales Reports*

Regarding any harm to CNC as a result of Schokinag's alleged failure to properly report product sales, the Court notes that Schokinag maintains that it has all along continued to provide CNC with credits and/or payments in accordance with the parties' profit sharing arrangement embodied in the Joint Venture Agreement, again, under the same conditions that existed prior to the termination of that contract. To the extent that Schokinag was deficient in its reporting obligations or that any contractually designated payments to CNC were otherwise not properly made, any such error, once identified, can be corrected with money damages accounting for the shortfall. Any such error is not, therefore, sufficient to qualify as irreparable harm.

### 4. *Delay in Seeking Relief*

In terms of elapsed time, the Court does note that CNC waited some eight to nine months after the date it asserts the parties' contract was terminated, namely, September 9, 2002, to seek the injunctive relief presently under consideration. This delay independently rebuts any presumption of irreparable harm. *See Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir.1995) ("Nonetheless, any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." (citations omitted)); *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7, 8 (2d Cir.1985) ("Lack of diligence, standing alone, may, however, preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm rather than occasioned prejudice."); *Citibank, N.A. v. Citytrust And Citytrust Bancorp, Inc.*, 756 F.2d 273, 276 (2d Cir.1985) ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." (citations omitted)).

The Court recognizes that "[i]f the movant can provide a credible explanation for its inactivity, however, ... delays may be excused." *Gidatex, S.R.L. v. Campaniello Imports, Ltd.*, 13 F.Supp.2d 417, 419 (S.D.N.Y.1998) (citations omitted); *see Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir.1995) ("[A] delay in filing suit will not rebut the presumption of irreparable harm *if the plaintiff does not know* how severe the infringement is.... Similarly, a delay caused by a plaintiff's *good faith efforts to investigate* an infringement does not rebut the presumption of irreparable harm." (citations omitted; emphasis added)); *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 125 (2d Cir.1994) (same); *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir.1992) (same).

While CNC attributes its delay in seeking injunctive relief to its own failure to fully appreciate the extent of the harm until learning about Schokinag's presence at two trade shows in early and mid-May 2003, the Court rejects this explanation because the same co-branded products appeared at the same and similar trade shows, often along with CNC's principal, John Down, in 2001 and 2002 during the existence of the joint venture. (*See e.g.*, Tr. at 11, 30–31; CNC Br. at 1, 5.) This background, and Schokinag's history all the while of substantially adhering to the methods of production, packaging, and distribution of the co-branded items followed during the joint venture, undercut CNC's suggestion that it could not anticipate Schokinag's presence at these trade shows

and appreciate the alleged harm that would follow.

CNC also identifies as a reason for the delay its pursuit of settlement discussions, but the letters exchanged by the parties addressing settlement that CNC submitted in support of this claim were dated from October 2002 through January 2003, (Down Suppl. Decl., ¶¶ 3—8, Ex. 1—5), leaving unaccounted for a period of approximately four months. Courts have found the presumption of irreparable harm rebutted in the face of shorter periods. *See, e.g., Citibank, N.A.*, 756 F.2d at 276 (reversing district court's grant of preliminary injunction, Second Circuit noted: "Yet Citibank did not seek the injunction until September 14—more than ten weeks after it learned directly of Citytrust's plans .... In short, Citibank's failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." (citation omitted; internal quotations omitted)); *Magnet Communications, LLC v. Magnet Communications, Inc.*, No. 00 Civ. 5746, 2001 WL 1097865, at *1 (S.D.N.Y. Sept.19, 2001) ("That alone is a delay of twelve weeks, and such a delay tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." (citation omitted; internal quotations omitted)); *Gidatex, S.R.L.*, 13 F.Supp.2d at 419 ("[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." (citations omitted)); *The Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F.Supp. 976, 980 (S.D.N.Y.1989) (district court denied preliminary injunction, finding no irreparable

harm in part based on plaintiffs' delay, noting: "Even giving the plaintiffs credit for attempting to reach a settlement without litigation, we are still left with a three month delay since the plaintiffs' last communication with the defendant.").[2]

Accordingly, the Court concludes that CNC has failed to set forth an adequate showing of irreparable harm, and its application for preliminary injunctive relief must therefore be denied.

## C. *INVENTORY SELL–OFF*

Separately, CNC relies on *Ryan v. Volpone Stamp Co., Inc.*, 107 F.Supp.2d 369, 384–85 (S.D.N.Y.2000), to argue that a licensee is not entitled to sell off remaining inventory following the termination of a licensing agreement. The Court notes that CNC's presentation has, for the reasons set forth above, failed to demonstrate irreparable harm. The Court will, however, briefly comment on the matter of inventory. While the Court recognizes that *Ryan* does seem to preclude a licensee's selling off leftover inventory produced during the licensing agreement, that case is distinguishable on two very significant grounds.

First, it is clear that, as discussed at the outset, Schokinag is not a licensee in this matter, but, rather, a joint venture partner of CNC. To reiterate, CNC itself explains that "CNC and Schokinag decided to *work together in producing and co-branding* a line of home baking products." (CNC Br. at 3 (emphasis added).) The parties agreement itself is entitled "Joint Development/Marketing Agreement," and the very first sentence therein states that: "Schokinag Chocolate North America, Inc. and Christopher Norman Chocolates, Ltd. will *co-develop* a line of premium chocolate

---

**2.** Additionally, the Court notes that it would not be inclined to excuse the entire eight to nine month period of delay even if evidence existed establishing that some settlement discussions occurred beyond January 2003.

bars ...." (emphasis added.) Both parties' trademarks appear on the co-branded items produced pursuant to their joint venture. The agreement allocates joint responsibility to both parties regarding matters including publicity, "aesthetic issues," and product promotion. It allocates primary responsibility to CNC regarding packaging design but provides for Schokinag's approval of "all final designs and copy." Finally, the agreement provides for an equal profit sharing arrangement based on per unit sales.

Second, the licensing agreement in *Ryan* contained a termination date, whereas the Joint Venture Agreement between CNC and Schokinag does not. This distinction is relevant because the Court in *Ryan* concluded that the licensee could not sell off remaining inventory because

> if a licensee could sell inventory manufactured during the term of the license over an indefinite period after its termination or expiration, the expiration date would have little force or meaning. One can imagine a scenario where a licensee intentionally creates a large surplus and thereby grants to itself a de facto extension of the license.

107 F.Supp.2d at 385.

The Court finds these distinctions significant because considerations regarding public perception, product quality, inventory control and the associated risk of overproduction or underproduction, etc. apply very differently in a joint venture relationship as compared to a licensing arrangement. Unlike a trademark licensee, whose only real risk concerns inventory production as reflected in *Ryan*, joint venture partners face all of the same risks of a trademark licensor in addition to those associated with inventory size. The principles underlying the Court's reasoning in *Ryan* therefore do not properly extend to joint venture arrangements gone awry, particularly where, as here, no expiration date for the joint venture is delineated in the parties' agreement.

In this case, apparently mindful of such risks to its own trademark, Schokinag represents that it has packaged and marketed the co-branded items utilizing the same methods employed during the joint venture and has represented that it will continue to adhere to these methods. The Court recognizes that products marketed to a narrow market—here, home chefs shopping at "upscale" retailers—sell slowly, as evident in CNC's own submissions indicating that some of the co-branded inventory it sold to Dean & Deluca stores and Martha Stewart retailers during the joint venture are still available through these sources to consumers today. (Down Suppl. Decl., ¶ 16; Kim Decl., ¶¶ 2–5, Ex. A—D.) In light of the specific niche market for these products, and of Schokinag's expressed commitment to restrict its continuing sales efforts to the same retail channels that existed prior to the termination of the parties' contract, the Court does not find that Schokinag's continued sell-off of inventory during a reasonable period of time would create irreparable harm to CNC.

### III. *CONCLUSION AND ORDER*

For the reasons discussed above, the Court concludes that the circumstances presented here do not warrant the extraordinary injunctive relief CNC seeks. Accordingly, it is hereby

**ORDERED** that plaintiff Christopher Norman Chocolates, Ltd.'s application for a preliminary injunction preventing defendant Schokinag Chocolates North America, Inc. from promoting, advertising, marketing, or selling chocolate products bearing CNC's name and logo is DENIED without prejudice to renewal in the event that Schokinag's represented intentions change materially in such a way as to measurably

and irreparably implicate CNC's trademark rights; and it is further

**ORDERED** that the parties are directed to update the Court as to the progress of their efforts to arrive at a disposition of this matter on or before July 21, 2003.

**SO ORDERED.**