**TIMES MIRROR MAGAZINES, INC.,**
Plaintiff–Counter–Defendant–
Appellant,

v.

**FIELD & STREAM LICENSES COM-
PANY & Jerome V. Lavin, Defen-
dants–Counter–Claimants–Appellees.**

Docket No. 01–7011.

United States Court of Appeals,
Second Circuit.

Argued: Nov. 13, 2001.

Last Supplemental Briefing Received:
Dec. 10, 2001.

Decided: June 26, 2002.

Thomas C. Morrisson, Patterson, Belknap, Webb & Tyler, LLP, New York, N.Y. (Ilene J. Strauss, of counsel, on the brief); Katten Muchin Zavis (Anthony J. McShane, of counsel), Chicago, IL, on the brief; and Douglass B. Maynard, Associate General Counsel Time, Inc., on the brief, for Plaintiff–Counter–Defendant–Appellant.

Roger L. Zissu, Fross, Zelnick, Lehrman & Zissu, P.C. (Craig S. Mende and Tamar Niv, of counsel, on the brief), New York, NY, for Defendants–Counter–Claimants–Appellees.

Before: FEINBERG, CARDAMONE, and POOLER, Circuit Judges.

POOLER, Circuit Judge.

Times Mirror Magazines, Inc. ("TM") owns and publishes Field & Stream Magazine. TM,[1] and its predecessor in interest, the Columbia Broadcasting System ("CBS"), entered into a series of agreements with defendants to govern the use of the name Field & Stream as a trademark. At the core of this appeal lies TM's contention that the agreements left TM with a residual common law right to use the mark in connection with all items associated with hunting and fishing. We conclude that no such residual right exists and that the parties' relative rights to the mark are governed by their agreements. Because defendants acted within their rights under the agreements and TM has not shown that the public interest requires rescission of the contracts, we affirm.

## BACKGROUND

Field & Stream Magazine has been published since 1895. The magazine focuses on hunting, fishing, and other outdoor themes and reaches approximately 14 million readers per month.

The magazine's owners were not the first to register "Field & Stream" as a trademark, however. Gordon & Ferguson

---

1. TM is now owned by Time, Inc., a subsidiary of AOL Time Warner, Inc.

Company, the owner of Gordon & Ferguson Merchandising Company (collectively, "G & F"), has been in business since 1871. G & F began selling clothing under the name "Field & Stream" in 1915 and first registered the name as a trademark for clothing in 1926. TM registered "Field & Stream" as a trademark for its monthly magazine on October 23, 1984, and later registered the mark for video cassette tapes featuring outdoor activities; calendars; credit card, debit card and cash disbursement services; and entertainment services.

In 1976, defendant Jerome V. Lavin took control of the various G & F businesses. In 1984, Lavin formed defendant Field & Stream Licenses Company ("FSLC") to license the Field & Stream mark to third parties that manufacture and sell clothing.

### The Disputes and Resulting Agreements

CBS, which then owned Field & Stream magazine, and G & F eventually came into conflict over use of the mark, and in 1984, they entered into an agreement (the "1984 Agreement") to resolve that conflict. CBS agreed that G & F had "the exclusive rights, worldwide ... in and to the use of the trademark FIELD & STREAM on and in connection with items of apparel." The agreement defined "apparel" as "any item of clothing or dress which may normally be worn on the human body, excluding however, jewelry, boots, shoes and other items of footwear." CBS also agreed not to contest any trademark registration application that G & F made in connection with apparel.

G & F, in turn, acknowledged the exclusive worldwide rights of CBS to use the Field & Stream trademark for magazines and publications and "on ... such other products, related to hunting, fishing and associated outdoor activities, as have been offered and sold by ... FIELD & STREAM magazine under such trademark in the past ... including by way of example but not limitation figurines, prints, books, and binoculars." The agreement allowed CBS six months to review its prior offerings and expand the list of items on which it had used the mark. CBS did not add to the list. G & F also gave CBS an exclusive license to use the mark in connection with socks and a non-exclusive license for men's ties and women's scarves. Finally, G & F recognized that CBS was concerned over the use of the mark on "the following merchandise which is extensively advertised in FIELD & STREAM magazine, namely, fishing rods, reels, lures, lines, guns, shells and bullets, tents, and sleeping bags." To avoid alienating Field & Stream Magazine's advertisers, both parties agreed to neither manufacture nor sell these items using the mark.

In 1989, FSLC filed five intent to use ("ITU") trademark applications[2] in connection with the Field & Stream mark for merchandise including sunglasses; hunting knives and hunting seats; utility boxes; flashlights; clocks; watches; desk accessories; retail clothing store services; and retail sporting goods and services. After TM objected to the applications, the parties again entered into negotiations "over their respective rights in the FIELD & STREAM mark." Pl.'s Compl. ¶ 14.

The resulting agreement, signed in 1991 ("1991 Agreement"), reaffirmed the 1984 Agreement except as specifically modified. It also (1) terminated TM's right to use the mark on ties and scarves; (2) deleted the portion of the 1984 Agreement that pre-

---

**2.** Section 1051 of Title 15 provides that "[a] person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark...."

vented TM from using the mark on fishing rods, reels, lures, lines, guns, shells, and bullets and gave TM the exclusive right to use the mark on these items; (3) required FSLC to delete utility boxes sold empty and hunting and archery equipment from its applications; (4) required FSLC to replace "hunting knives" in the applications with "pocket knives and cutlery, and table knives, not designed for use primarily for hunting and fishing"; (5) required FSLC to specify that the sunglasses covered by the application were "not designed for use primarily for hunting or fishing"; and (6) provided that FSLC would withdraw entirely another application. In return for the amended and withdrawn applications, TM agreed not to oppose FSLC's remaining ITU applications.

On November 11, 1993, FSLC filed twenty-two additional ITU applications for 165 products, some of which were related to hunting, fishing, and similar outdoor activities. After TM objected, the parties entered into two additional agreements-one made in 1994 ("1994 Agreement") and the other in 1995.

The 1994 Agreement did not specifically address the ITU applications. It (1) continued the 1984 and 1991 agreements except as specifically modified; (2) terminated TM's right to use the mark on socks; (3) gave TM the exclusive right to use the mark in connection with tents and sleeping bags; (4) provided for payments of royalties by TM to FSLC on sales of tents and sleeping bags and by FSLC to TM on sales of socks; (5) precluded TM from disposing of its mark for tents and sleeping bags without FSLC's consent and FSLC from selling its mark for socks without TM's consent; (6) provided for sharing profits equally should the mark for sleep-

ing bags, tents, or socks be sold; and (7) precluded each party from using the other's typography for the mark.[3] The agreement also included the following paragraph:

> The acknowledgment of rights [to use the trademark] (a) shall be limited to the products specifically referred to . . .; (b) shall not be deemed to create or limit any rights to the trademark Field & Stream with respect to any other product, including, without limitation, other camping products; and (c) shall not be used in any dispute between Times Mirror and [FSLC] to expand or limit the rights of Times Mirror or [FSLC] to the trademark Field & Stream with respect to any other product, including other camping products.

In June 1995, the parties signed the "Field & Stream ITU and Related Matters Settlement Agreement" ("1995 Agreement"), which recites that the parties wished to settle the ITU controversy "and related matters." The 1995 Agreement contains a merger clause: "This Agreement constitutes the complete and exclusive statement of agreement between the parties hereto with respect to the ITU Applications and related subject matter hereof and supersedes all prior written and oral agreements or statements by and between the parties hereto."

In addition to these general provisions, the 1995 Agreement set out the rights of the parties in four areas: first, it granted an exclusive right to use the trademark on certain goods to each of the parties; second, it provided a mechanism for one party to capture an exclusive right to use the trademark in connection with goods listed in the ITUs but not allocated to either of

---

**3.** Three months after entering into this agreement, TM and FSLC agreed to a variety of joint licensing ventures for clothing.

the parties; third, for certain other products, it allowed the parties to attempt to capture the right to use the mark on an alternating basis; and fourth, it contained provisions designed to discourage future trademark contests and litigation.

The 1995 Agreement gave TM the exclusive right to use the mark in connection with non-chemical fuel additives for two-cycle gasoline engines, trolling motors for water-going crafts, and electric depth finders and required FSLC to delete these items from its ITU applications. FSLC received the exclusive right to the mark in connection with many other items including life saving vests, portable refrigeration devices, electric blankets, and "storage boxes except boxes designed and sold exclusively as fishing tackle boxes."

As to goods listed in the ITU applications but not specifically allocated to either party, the 1995 Agreement allowed the party that first used or licensed the mark in connection with a particular class of goods an exclusive right to the mark for that class, provided that the user or licensor followed certain notification procedures. A party that commenced use or sale of any such product was required to notify the other party in writing, and "upon written request" to provide substantial evidence of use, which was defined as "(i) copies of written contracts . . .; (ii) product designs, samples or prototypes; (iii) purchase orders or paid invoices; and (iv) product sales material or advertising."

If, on the other hand, a party merely began negotiating the sale of a license, it was required only to notify the other party. For a period of ninety days after notification, the negotiating party had the exclusive right to negotiate the license. If the negotiating party failed to strike a bargain within the ninety-day period or abandoned its efforts, the other party could seek a licensing arrangement. Upon discontinuing its efforts within the ninety-day period or arriving at an agreement, the negotiating party was obligated to notify the other party. If the negotiating party entered into an actual agreement, it was required to certify that its "licensee (i) is a third party that is not an 'Affiliate' . . ., (ii) has an operating business, and (iii) is in the product business for the goods to be licensed or has the qualifications to be in such business."

TM had a one-year first opportunity to license row boats, speed boats, canoes, inflatable boats, boat trailers, canoe paddles, boat oars, boat ladders, maps, boat covers, and non-trolling motors for water-going craft. For any of these products that TM did not license within a year, FSLC would get the exclusive licensing right for the next twelve months. Thereafter, the parties alternated exclusive rights on any of the products that remained unlicensed every twelve months.

In provisions designed to avoid future litigation, TM agreed to withdraw its opposition to FSLC's remaining ITU applications, and both parties promised that they would not "file any future applications to register the Trademark for any product except based upon actual use or licensing of the Trademark for such product." The parties also agreed to "use [their] best efforts to not use, license or apply for registration of the Trademark for a product that is confusingly similar to a product used, licensed or registered by the other party under the Trademark." Finally, they agreed that

> If a party hereto has a product specified . . . to be reserved exclusively to that party (the "Use Party"), the other party . . . shall not at any time file any opposition or cancellation with the U.S. Patent and Trademark Office ("PTO"), commence any civil proceeding for damages or injunctive relief, or make any other

legal claim that directly or indirectly would hinder the Use Party's use of the Trademark for a product reserved exclusively to the Use Party or prevent the PTO from issuing a trademark registration to the Use Party. . . .

In June 1995, FSLC gave TM notice that it had entered into negotiations with a prospective licensee, the National Buying Syndicate ("NBS"). These negotiations did not succeed, but during a three-month period beginning in July 1995, FSLC entered into five license agreements that TM claims are shams. The licensed items included camping equipment, toys, furniture, utility boxes for multi-purpose use, trucks, vans, cars, and recreational vehicles. In November 1995 and August 1996, FSLC entered into licensing agreements with Triad Sportswear for the use of the mark on hunting and fishing apparel. In January 1996, FSLC licensed the mark to Suntime International for use on watches.

### The Lawsuit and the District Court's Decision

On December 10, 1996, TM filed a lawsuit against FSLC. TM alleged breach of contract, trademark infringement, false designation of origin, and unfair competition. In addition to other relief, TM sought rescission of all its contracts with FSLC, a declaratory judgment and injunctive relief limiting FSLC's right in the mark to apparel, and cancellation of some of FSLC's registrations and applications for registration. FSLC answered and counterclaimed, alleging that TM breached the 1995 Agreement by opposing some of FSLC's trademark applications and filing this lawsuit.

After the completion of discovery, FSLC and Lavin moved for summary judgment. Judge Chin granted their motion in a careful and thorough opinion. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F.Supp.2d 711 (S.D.N.Y. 2000). He first found that the 1995 Agreement settled all outstanding matters between the parties and therefore declined to address alleged breaches that occurred before June 1995. *Id.* at 721. Next, he found that each of the agreements was clear on its face. *Id.* at 722. After parsing each of the agreements, Judge Chin also found that the agreements did not, either singly or in combination, give TM the exclusive right it claimed to all goods associated with hunting and fishing. *Id.* at 723–28. Alternatively, he found that even if the earlier agreements could be construed as giving TM an exclusive right to use the mark in the areas of hunting and fishing, the 1995 Agreement superceded all prior agreements and set out rules for the licensing of products not listed in the ITUs. *Id.* at 727. The court also found that the 1995 Agreement did not prohibit either party from capturing products listed in the ITU applications by licensing the mark to a third party but rather explicitly contemplated such captures. *Id.*

Applying the general principles that it had formulated, that is, that pre–1995 breaches were not actionable, TM did not have an exclusive right to use the mark in connection with hunting and fishing products, and either party could capture the mark for use in connection with a given product by licensing the mark to a third party, Judge Chin rejected TM's claim that defendants materially breached the agreements by (1) developing and attempting to sell a utility box that could be used as a fishing tackle box; (2) attempting to capture fields of use by misrepresenting that it was engaged in bona fide negotiations to license the mark to NBS; (3) entering into sham licensing agreements; (4) developing, manufacturing, or selling products intended for hunting, fishing, sporting, or other outdoor activities; (5)

falsely claiming in applications to the United States Patent and Trade Office that it had used the mark in connection with certain products. *Id.* at 728–35.

In discussing the utility box claim, Judge Chin held that the 1995 Agreement only required "FSLC to *amend* its ITU application to exclude storage boxes designed and sold exclusively as fishing tackle boxes [and did not] prohibit FSLC from *using* the Field & Stream mark in connection with fishing tackle boxes." *Id.* at 729. Therefore, FSLC retained the right to capture fishing tackle boxes by first use, and its use of the mark in connection with the boxes did not violate the 1995 Agreement. *Id.*

Judge Chin also rejected TM's contention that FSLC's 1995 negotiations with NBS breached the agreement. He found that the 1995 Agreement did not require that "negotiations with potential licenses be 'substantial and bona fide'" but rather required only that the negotiating party notify the other party that it had begun negotiations. *Id.* at 730. Because FSLC never reached an agreement with NBS, the judge found FSLC had no obligation to comply with any of the other requirements of the first use provision. *Id.* at 730–31. Judge Chin further noted that even though FSLC did not notify TM that it had terminated negotiations with NBS, TM conceded that none of its breach of contract claims were based on this alleged lack of notification and, in any event, a breach based on failure to notify TM of the termination of negotiations would be immaterial as a matter of law. *Id.* at 731.

TM's contention that licensing agreements between FSLC and Bimini Bay Outfitters, Folsom, Casual Lifestyles, Adventurous Products, A Sporting Frame of Mind, and Waldoch Crafts were illusory and breached the 1995 Agreement fared no better. TM based its argument on the following indicia: (1) FSLC drafted all the agreements; (2) the agreements did not contain minimum advertising, net worth, or license fee requirements; (3) only brief negotiations and financial discussions preceded the licensing; (4) the licensees did not advertise or "otherwise market the products" they produced; and (5) "few, if any, products were actually manufactured and sold." *Id.* at 732. Finding that the 1995 Agreement required only that FSLC provide TM with a copy of the license agreement and certification of the licensee's independence and capacity, Judge Chin rejected TM's argument. *Id.*

Because Judge Chin already had rejected TM's claim that the agreements gave TM an exclusive right "to use the mark in connection with the broad category of products relating to hunting, fishing, and outdoor activities," he found that FSLC did not breach the agreement by selling such products. *Id.* at 733.

The judge rejected TM's claim of breach based on misstatements in trademark applications because two of the claimed misstatements were not false, and the third, even if false, was not material. *Id.* at 733–34.

In addition to seeking rescission based on alleged express breaches of the agreements, TM argued that it was entitled to rescission because FSLC breached the agreements' implied covenants of good faith and fair dealing. Judge Chin found that TM could not prevail on this argument because TM had not shown it was deprived of any benefits of the contracts. *Id.* at 735.. He additionally found that TM waived its right to termination by continuing to do business with FSLC after the alleged breaches. *Id.* at 735–37.

The court also rejected TM's trademark infringement, false designation of origin, and unfair competition claims, finding the

claims to be precluded by the parties' contracts and declining to set the contracts aside to protect the public interest. In rejecting the public interest argument, the court found that confusion caused by the concurrent use the parties' agreements allowed "would [not] create a level of confusion that would·cause harm to the consuming public." *Id.* at 739.

In October 2000, Judge Chin conducted a bench trial on FSLC's counterclaim, found in FSLC's favor, and awarded FSLC attorney's fees and costs as damages for TM's breach. The judgment entered at the end of the litigation stated that the 1995 agreement did not entirely supercede all prior agreements and that the other agreements continued to govern the parties' rights in the mark "except to the extent that any matters addressed in a prior agreement are covered in a subsequent agreement."

### Contentions on Appeal

This appeal followed. TM principally contends that (1) the district court misconstrued its task by looking exclusively to the agreements to determine the scope of TM's trademark rights rather than first assessing TM's original common law right in the mark; (2) the court erred when it found FSLC did not materially breach the agreements; (3) even if TM bargained away its right to use the mark on the contested items, FSLC's use of the mark would confuse the public, requiring that the court prevent FSLC from using the mark; and (4) the district court erred by finding that TM's filing of the lawsuit and of opposition to FSLC's trademark applications were not justified by FSLC's material breaches.

### DISCUSSION

#### I. Standard of Review.

■ We review *de novo* the district court's grant of summary judgment and construe the record in favor of the party opposing summary judgment. *McCarthy v. Am. Int'l Group,* 283 F.3d 121, 123 (2d Cir.2002). We review the district court's trial findings of fact for clear error only but review its conclusions of law *de novo. Tho Dinh Tran v. Alphonse Hotel Corp.,* 281 F.3d 23, 30 (2d Cir.2002).

#### II. TM's Rights in its Mark Before Entering Into the Agreement.

In TM's view, the district court's failure to conduct a trademark analysis to determine the scope of TM's preexisting trademark rights engendered its most serious error: finding that TM did not have an exclusive right to use the mark on products related to hunting and fishing. That is, because the court assumed TM had no rights in the mark prior to signing the 1984 concurrent use agreement, the court mistakenly examined the agreements to find what rights they gave each of the parties rather than what portion of TM's previously existing rights they took away. We agree that TM and FSLC may have rights under both the common law of trademarks and the contracts. *See, e.g., Sterling Drug, Inc. v. Bayer, A.G.,* 14 F.3d 733, 739–40 (2d Cir.1994) (addressing separately breach of contract claim based on concurrent use agreement and trademark infringement claim based on the Lanham Act).

TM's claim is that as the holder of a strong mark, it is entitled to expand into other fields and can treat a junior user in those related fields as an infringer. Possession of a famous or strong mark entitles the possessor to broad protection for related goods. *E.g., Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 258 (2d Cir.1987). This general principle applies to magazines. *See, e.g., Triangle Publ'ns,*

*Inc. v. Rohrlich,* 167 F.2d 969, 970, 972–73 (2d Cir.1948) (protecting *Seventeen Magazine*'s trademark, Seventeen, against use by a girdle manufacturer because mark was fanciful or arbitrary and consumers likely would be confused as to the magazine's sponsorship of the girdle), *overruled in non-pertinent part, Monsanto Chem. Co. v. Perfect Prods. Mfg. Co.,* 349 F.2d 389 (2d Cir.1995). *But cf. Esquire, Inc. v. Esquire, Slipper Mfg. Co.,* 243 F.2d 540, 543 (1st Cir.1957) (holding that magazine publisher cannot "pluck a word with favorable connotations for his goods or services out of the general vocabulary and appropriate it to his exclusive use no matter how much effort and money he may expend in the attempt" but that mark was entitled to some protection).

FSLC argues that TM's rights in the mark are limited by TM's 100–year plus failure to use the mark for anything but its magazine, books, prints, and binoculars. FSLC also points out that it has used the Field & Stream mark on clothing related to hunting for almost ninety years.

█ We conclude for two reasons that the rights of the parties to use the mark in connection with the goods at issue in this lawsuit are defined by the agreements rather than by any residual trademark right. First, the parties' use of the marks prior to the 1984 Agreement does not demonstrate that TM had a greater right than FSLC to expand use of the mark into the general domain of goods associated with hunting and fishing. Second, as explained in the next section, the agreements address all of the breaches that TM claims FSLC committed.

TM emphasizes its long-standing use of the Field & Stream mark in connection with its well-known hunting and fishing magazine, but TM ignores or minimizes FSLC's and G & F's almost ninety-year use of the same mark for clothing including fishing and hunting clothing. G & F extensively used the mark in price lists and catalogs for its hunting, fishing, and outdoor apparel, beginning as early as 1915. It also registered the mark for clothing in 1926. Because FSLC continually maintained its registration of the mark, FSLC's mark is incontestable and, as a matter of law, it has acquired secondary meaning. *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1076–77 (2d Cir.1993).

Although TM has produced little or no evidence of the strength of its mark at the time the publisher began entering into contracts with FSLC and no proof of the mark's strength in 1915 when FSLC first used it, we see no reason to question TM's contention that the mark had long since acquired secondary meaning identifying it as the source of Field & Stream magazine. Nor does FSLC question TM's assertion that Field & Stream is far better known as the magazine's mark than as G & F's mark for clothing. Nevertheless, by 1984, both parties used the mark on products associated with hunting and fishing and both had a strong mark.

As a consequence of both parties' long term use of the mark, this litigation is very different from the more usual case in which a senior user attempts to protect its mark against infringement by a junior user in a related field. For instance, in *Mobil Oil,* the senior user had used its mark for its petroleum business for fifty years when the junior user adopted a closely related mark for its oil trading business, causing the senior user to bring a prompt infringement claim. 818 F.2d at 255–56. In *Triangle Publ'ns,* we found that the title *Seventeen* was arbitrary and fanciful, the junior user adopted the name in bad faith, and the association of *Seventeen* with teenage girls' clothing likely would cause confusion as to source. 167

F.2d at 972. In contrast, we now address the scope of protection to be accorded two rightful users of the mark. Both TM and FSLC had used the mark in connection with goods associated with hunting and fishing before they entered into any of the concurrent use agreements, but neither had attempted to enter the related markets at issue in this lawsuit. Under these circumstances, neither party had an automatic entitlement to expand into the market for other hunting and fishing products to the exclusion of the other. *See Physicians Formula Cosmetics, Inc. v. W. Cabot Cosmetics, Inc.*, 857 F.2d 80, 82–83 n. 1 (2d Cir.1998) (stating that "[t]he owner's rights in such appendant markets are easily lost; they must be asserted early, lest they be made the means of reaping a harvest which others have sown" (internal quotation marks and citation omitted)). Because neither G & F nor CBS acted promptly to capture by actual use the many products associated with hunting, fishing, and the outdoors, the district court correctly found that the agreements define their rights.

### III. Breach of Contract.

TM claims error in the district court's findings that the 1995 Agreement settled all claims outstanding before its execution; the majority of the alleged post–1995 Agreement breaches did not violate any of the agreements between the parties; those breaches that did occur were not material and thus did not justify rescission; FSLC breached no duty of good faith; and, even assuming that material breaches occurred, TM waived its right to seek rescission.

#### *Did the June 1995 Agreement Settle All Outstanding Breaches?*

The 1995 Agreement provided that it was intended to settle the objections to the ITU applications and all "related matters."

The district court found that this clause meant the agreement settled all outstanding disputes between the parties and precluded TM from complaining of breaches prior to June 1995. TM disputes this holding, arguing that the 1995 Agreement only settled the ITU applications and TM's opposition to those applications. As an initial matter, the 1995 Agreement clearly did more than settle the controversy concerning the ITU applications. It contained a clause providing that neither party would use the mark in the future on any product that was confusingly similar to a product on which the other party used the mark, thus indicating that the parties contemplated use of the trademark on goods other than those included in the ITU applications.

Although we agree that the 1995 Agreement did not purport to settle every possible breach of earlier agreements, this conclusion has no practical significance because TM identifies no breaches that were not resolved by the 1995 Agreement or one of its predecessors. In fact, all of the alleged breaches in TM's complaint took place after June 1995. And, in response to FSLC's interrogatory request for a listing of contractual breaches, TM identified only conduct occurring after June 1995. Thus, the district court did not ignore actionable breaches occurring prior to June 1995.

#### *Post–1995 Conduct.*

TM claims that after executing the 1995 Agreement, defendants materially breached it and earlier agreements by executing a series of sham licenses solely for the purpose of capturing a field of use; licensing third parties to sell a wide range of fishing and hunting gear; and failing to act in good faith. In TM's view, the court's finding of no material breach is based on a two-fold error. First, because the district

court erroneously concluded that the 1995 Agreement superceded all prior agreements, it did not measure FSLC's conduct against the earlier agreements. Second, the court misinterpreted the 1995 Agreement itself.

■ The first argument entirely lacks merit. When Judge Chin discussed TM's claim of a general right to use the mark on products related to hunting and fishing, he said that the 1995 Agreement superceded the prior agreements and gave TM no such right. However, this was an alternative holding. Judge Chin first examined each of the individual agreements to determine whether they gave TM the right it claimed. This approach is consistent with the final judgment's declaration that earlier agreements survived except as to matters covered in the 1995 Agreement, and we believe it to be correct. The earlier agreements allocated specific items to the parties. If a later agreement did not change an allocation, that allocation remained in effect. For instance, despite the 1995 Agreement, TM could not claim a right to use the mark on apparel. Nor could FSLC use the mark on a magazine or on guns and bullets. However, the 1995 Agreement was the first to set out a procedure for capturing marks not specifically allocated to either party. It therefore has a scope and significance for the current dispute that the earlier agreements do not have.

### Sham Licenses.

■ TM argues that licenses FSLC issued to Casual Lifestyles, Adventurous Products, Waldoch Crafts, A Sporting Frame of Mind, and Bimini Bay Outfitters are shams because minimal or no sales resulted, none of the licensed products was advertised or promoted, and many of the licensees had not previously produced the licensed products. This argument ignores the language of the 1995 Agreement which, with respect to licensing agreements, requires only that the licensing party provide a copy of the license and certify to the other party "that the licensee (i) is a third party that is not an 'Affiliate' . . . of the licensing party, (ii) has an operating business, and (iii) is in the product business for the goods to be licensed or has the qualifications to be in such business." A written demand from the other party obligates the licensing party to "promptly provide" certain documentary and other evidence of the "bona fide nature" of the license. Even then, the materials must be furnished only "when available." The conduct TM alleges does not breach the agreement because TM concedes FSLC filed the written certifications and TM does not claim the certifications were false. TM also does not allege that it made a written demand for further evidence. Because the contract set out both the materials relevant to determining whether a licensing agreement was made in good faith and the procedures to be used, TM cannot claim breach without first testing FSLC's good faith through the procedures set forth in the agreement.

### Licenses to Sell Hunting and Fishing Gear.

■ FSLC entered into a variety of licensing agreements for hunting and fishing apparel including a vest used as a substitute for a tackle box and carry packs and luggage used in hunting. FSLC also produced a plastic utility box for fishing, hunting, camping, crafts, hiking, boating and first aid under the Field & Stream mark.

TM's contention that FSLC cannot use the mark on hunting and fishing apparel is frivolous. The 1984 Agreement allocated apparel, defined as "any item of clothing or dress which may normally be worn on the

human body," other than footwear and jewelry, to FSLC. Although the agreement gave CBS rights in specified and limited merchandise it had advertised in its magazine *and* sold under the Field & Stream mark, it specifically excluded apparel from that grant. To argue that hunting and fishing apparel is not apparel distorts the plain language of the agreement.

Nor do the agreements, which are very specific, grant TM an exclusive right to use the mark in connection with other goods associated with hunting, fishing, and the outdoors. The first agreement gave TM an exclusive right to use the mark only on magazines and items it previously had sold under the mark. TM does not claim it ever sold any of the products at issue here under its mark. The 1991 Agreement expanded TM's rights to include "fishing rods, reels, lures, lines, guns, shells and bullets," which also are not at issue in this litigation.

Although the 1994 agreement added tents and sleeping bags to TM's domain, it provided that its allocation of rights to TM and FSLC would not "create or limit any rights to the trademark Field & Stream with respect to any other product including without limitation other camping products" and could not "be used in any dispute ... to expand or limit the rights of [TM] or [FSLC] to the trademark Field & Stream with respect to any other product, including other camping products." This agreement also gave FSLC a share in TM's profits from any sale or licensing of the mark for tents and sleeping bags and to royalties from the sale of the products themselves.

The 1995 Agreement gave FSLC exclusive rights to certain items related to camping, hunting, or fishing such as flotation vests and portable refrigeration de-

vices. It allowed both parties the opportunity to capture the right to use the mark in connection with other goods related to these fields including camp stoves, portable propane heaters, and propane lamps by first using or licensing the mark for these products. Certain goods like boats that are even more directly related to fishing were allocated to the parties on an alternating year basis. Finally, the agreement left both parties free to apply for licenses for any other goods as long as they were not confusingly similar to a product already used, licensed, or registered by the other party. Based on all these factors, the district court correctly concluded that the agreements, whether read in isolation or collectively, did not create a penumbral right in all products related to hunting, fishing, or the outdoors.

### *Bad Faith.*

■ TM also argues that even if FSLC's conduct did not breach an express duty set out in any of the agreements, it breached the duty of good faith and fair dealing that is implied in every New York contract.[4] *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289 (1995). The covenant includes "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* (internal quotation marks omitted). However, "no obligation can be implied that would be inconsistent with other terms of the contractual relationship." *Id.* at 980, 663 N.E.2d 289 (internal quotation marks omitted). TM claims that the allegedly sham licensing agreements and FSLC's use of the mark for hunting and fishing related products violate the implied covenant. Having already found that the

---

4. The parties do not question the district court's conclusion that New York law governs the contract claims. *See Times Mirror,* 103 F.Supp.2d at 722 & n. 8.

express terms of the agreements clearly set forth the parties' respective rights to use the mark on all products including hunting and fishing products and the parties' obligations with respect to licensing agreements, we also conclude that TM cannot avoid the express terms of the contract by relying on the implied covenant of good faith and fair dealing.

## IV. Voiding the Agreements on Public Policy Grounds.

The parties agree that contracts allocating rights in a trademark ordinarily are valid. TM argues that we nevertheless should rescind the agreements between TM and FSLC because they will inevitably cause substantial consumer confusion and thus injure the public interest. The district court rejected this argument based on its finding that TM failed to prove harm to the public interest from any confusion as to source. TM contends that the district court erred by requiring injury to the public rather than simply requiring a heightened showing of confusion.

We disagree. TM relies on several cases, all of which are inapposite because they concern the defenses of laches and acquiescence rather than a contract. *See Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 423 (4th Cir. 1998) ("[S]trong proof of likelihood of confusion—indeed, actual confusion—trumps the defenses of laches and acquiescence."); *Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1207 (11th Cir.1997) ("Thus, if the likelihood of confusion is inevitable, or so strong as to outweigh the effect of plaintiff's delay in bringing a suit, a court may in its discretion grant injunctive relief, even in cases where a suit for damages is appropriately barred."); *SunAmerica Corp. v. Sun Life Assurance Co.*, 77 F.3d 1325, 1334–36 (11th Cir.1996) (holding that a showing of inevit-

able confusion can overcome the estoppel effect of acquiescence); *Harley–Davidson, Inc. v. Estate of O'Connell*, 13 F.Supp.2d 271, 285 (N.D.N.Y.1998) (holding that a heightened showing of likelihood of confusion could overcome a laches defense to injunctive relief). *But cf. Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 (2d Cir.1996) (noting that although public interest is relevant to determining whether equitable defense of laches can be overcome, public interest is more likely to "overwhelm other considerations in the application of laches" when the public's health and safety is involved).

Laches and acquiescence are affirmative and equitable defenses. Acquiescence "requires proof of three elements: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *SunAmerica*, 77 F.3d at 1334. Laches is an unreasonable delay in asserting a right that prejudices the opposing party. *Conopco*, 95 F.3d at 192.

In contrast to these equitable defenses, trademark agreements, in which two parties agree on their respective rights in a mark, "are ... favored ... under the law." *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 55 (2d Cir.1997). In general, courts considering negotiated agreements governing mark use accord them greater deference than they give to the equitable defenses of laches and acquiescence. *See MWS Wire Indus. v. Cal. Fine Wire Co.*, 797 F.2d 799, 804 (9th Cir.1986) (holding that a compromise agreement between parties allowing senior user exclusive use of trademark that was acknowledged to be valid in the agreement would estop junior user from claiming in litigation that mark was not valid because

it was descriptive); *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 329 (6th Cir. 1973) (holding that "the public interest in guarding against the depletion of the general vocabulary available for the description of articles in commerce is not so great that it should take precedence over the rule of the law of contracts that a person should be held to his undertakings"); *Proriver, Inc. v. Red River Grill*, 83 F.Supp.2d 42, 45–46 (D.D.C.1999) (holding that it would not rescind party's agreement absent a showing of significant injury to the public). *But see VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1473–74 & n. 1 (9th Cir.1986) (holding that the public interest in avoiding confusion would suffice to invalidate contract if it outweighed the interest in upholding the contract and that in the case of different insurers, confusion as to source might outweigh the contractual interest).

■■■ We hold that in order to obtain rescission of a freely bargained trademark contract, a party must show that the public interest will be significantly injured if the contract is allowed to stand. We have no doubt that there are situations in which consumer confusion will cause such harm. For example, if the quality of the junior user's product or of the junior user's reputation is at issue, confusion as to source may be sufficient. *See VISA Int'l*, 784 F.2d at 1473–74 and n. 1 (significant consumer purchase in which the identity of the party standing behind the product may be important); *T & T Mfg Co. v. A.T. Cross Co.*, 587 F.2d 533, 538 (1st Cir.1978) (denying rescission of trademark agreement despite likelihood of confusion because there was no proof that consumers buying the junior user's product would receive an inferior product). Simple fairness requires holding a party to its contract unless adhering to the contract will damage the public and not just a contracting party. If members of the public, as a result of confusion, buy products of equal quality that do not threaten their health or safety, significant harm results only to a contracting party. In the absence of significant harm to the public, the district court correctly declined to don the mantle of public interest to save plaintiff from a harm that is permitted by the contract. We affirm dismissal of the trademark claim.

## V. The Counterclaim.

On the counterclaim, TM argues only that it was permitted to bring suit because FSLC materially breached the agreements between the parties. Having affirmed the district court's conclusion that there was no material breach, we must also affirm the judgment on the counterclaim.

## CONCLUSION

Because the district court correctly determined that FSLC and Lavin did not breach their contracts with TM and TM failed to establish either that it had a residual trademark right in hunting, fishing, and camping goods or that rescission of the contract was required to protect the public interest, we affirm the judgment of the district court.