**TOTAL CONTROL APPAREL, INC. Plaintiff,**

v.

**DMD INTERNATIONAL IMPORTS, LLC and Ross Stores, Inc., Defendants.**

**No. 05 CIV.9493(VM).**

United States District Court, S.D. New York.

Jan. 10, 2006.

Kenneth R. Schacter, Silverberg Stonehill & Goldsmith, P.C., New York, NY, for Plaintiff.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Total Control Apparel, Inc. ("Total Control") seeks a preliminary injunction restraining and enjoining DMD International Imports, LLC ("DMD") and Ross Stores, Inc. ("Ross Stores") (collectively "Defendants") from using the David Loren trademark (the "Mark" or the "David Loren Mark"), requiring Defendants to identify all allegedly infringing garments in their possession, and requiring DMD to provide documentation to Total Control regarding its possession and sale of allegedly infringing garments. Total Control claims that Defendants have infringed its registered trademark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, engaged in unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), engaged in trademark infringement under the common law of the state of New York, and violated the New York Anti–Dilution Statute.[1]

---

1. Total Control brings this count under New York General Business Law § 368–d, which was repealed in 1996. The anti-dilution provision was recodified at § 360–1 without change to the language of the statute. *See Brennan's, Inc. v. Brennan's Restaurant LLC,* No. 02 Civ. 9858, 2003 WL 1338681, at *6 n. 11 (S.D.N.Y. March 18, 2003).

A hearing on Total Control's motion was held before the Court on January 5, 2006 (the "Hearing"). At the conclusion of the Hearing, the Court ruled that it was not persuaded that Total Control had met the necessary legal standards for the Court to grant the injunctive relief requested. The Court indicated that its findings, reasoning and conclusions would be set forth in further detail in a subsequent Decision and Order, which is provided below.

Although the Court's Order to Show Cause of November 18, 2005 pertained only to a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, Total Control apparently seeks both a preliminary and a permanent injunction at this time. The permanent injunction is denied as premature. Furthermore, the Court declines to issue a preliminary injunction, as Total Control has failed to make a sufficient showing of irreparable harm, and its likelihood of success on the merits depends on the resolution of substantial factual issues which were not sufficiently developed at the Hearing.

## I. BACKGROUND

Total Control, a New York corporation, was engaged in the business of manufacturing apparel for other companies. (*See* Declaration of Raymond Dillulio, dated November 8, 2005 ("Dillulio Decl."), ¶ 2.) Take Control LLC ("Take Control"), an affiliate of Total Control, was formed to merchandise and sell apparel manufactured by Total Control. (*Id.* ¶ 3.)

## A. THE RELATIONSHIP BETWEEN THE PARTIES

In 2003, Take Control experienced financial difficulties. (*See id.* ¶ 6.) In connection with a settlement with its creditors, Take Control's inventory, open orders and other assets were turned over to the creditors, who in turn sold them to DMD. DMD is "a manufacturer and importer of ladies' apparel, for sale to the retail stores." (*See* Declaration of Steven Klein, dated December 7, 2005 ("Klein Decl."), ¶ 3.) Apparently, at the time of the settlement with its creditors, Take Control had almost two million dollars' worth of open orders that it did not have the resources to produce. (*See id.* ¶ 5; Agreement of September 30, 2005 (the "Assets Agreement"), attached as Exhibit A to Klein Decl.) DMD purchased these open orders and thereafter began to fulfill them.

Neither party discusses in the moving papers whether any or all of these open orders were for apparel bearing the David Loren Mark, whether all of these orders have now been fulfilled, and if so, at what point they were completely fulfilled. At the Hearing, however, Total Control asserted that none of the open orders sold to DMD were for David Loren apparel, that DMD's sales of the infringing product were based on new orders filled after the Assets Agreement was in place, and that as regards to only two such sales while the Agreement was in effect did Total Control give consent for DMD's use of the Mark. This allegation raises a significant factual issue, as discussed below, that was not sufficiently addressed on the record before the Court and that should be more fully developed in discovery.

The sale of Take Control's assets to DMD was accompanied by an understanding that Total Control's owners would acquire an ownership interest in DMD and its affiliated companies, DMD International, Ltd., Jeffrey Craig Imports LLC, and Jeffrey Craig, Ltd. (collectively the "Jeffrey Craig Companies"). (*See* Dillulio Decl. ¶ 6.) Thus Total Control Chief Executive Officer ("CEO") Raymond Dillulio, his brother Robert Dillulio, and Mark Carson ("Carson"), a partner in Take Control (the "Take Control Principals"), went to

work for the Jeffrey Craig Companies in or about October 2003. (*See* Declaration of Raymond Dillulio, dated December 23, 2005 (the "Dillulio Reply Decl."), ¶ 3; Klein Decl. ¶¶ 4, 7.) Raymond and Robert Dillulio continued to work with the Jeffrey Craig Companies in their Long Island City facility, where Raymond Dillulio oversaw production, until mid-March 2004, when both were terminated. (*See* Dillulio Reply Decl. ¶¶ 3, 4). Shortly thereafter, Raymond Dillulio formed A.J. Industries LLC ("A.J. Industries"). (*See* Dillulio Decl. ¶ 7.) Carson remained as a salesman at the Jeffrey Craig Companies until October 2005. (*See* Klein Decl. ¶ 16; Dillulio Reply Decl. ¶ 3.) Before, during and after the time that the Take Control Principals were working with DMD, Carson sold apparel bearing the David Loren Mark to Ross Stores (Klein Decl. ¶ 11; Affidavit of Judy Marshall, dated December 7, 2005 ("Marshall Aff."), ¶ 4.)

A buyer employed by Ross Stores represents that Ross Stores purchased David Loren merchandise from Total Control as far back as 2002. (*See* Marshall Aff. ¶ 4.) The buyer further asserts that Total Control and Take Control operated as one entity in their dealings with Ross Stores and that Carson informed her at some point early in their business relationship that Total Control also sold women's apparel bearing the David Loren Mark to Nordstrom. (*See id.* ¶¶ 4–5.)

## B. *THE DAVID LOREN MARK*

Total Control first applied for a trademark for the phrase "David Loren" in April 2000. (*See* United States Patent and Trademark Office Trademark Electronic Search System report, attached as Exhibit A to the Complaint.) In May 2000, Total Control began using the David Loren Mark on women's and men's sportswear it manufactured for sale by Take Control.

(*See* Dillulio Decl. ¶ 4.) The trademark was registered on December 3, 2003. (*See* Compl. Ex. A.)

The parties agree that Total Control permitted DMD to use the Mark while the Take Control Principals were working with DMD. (*See* Dillulio Decl. ¶ 7; Klein Decl. ¶ 11–16; Dillulio Reply Decl. ¶ 5.) However, they dispute the nature of this permission. Total Control asserts that, through its CEO, it orally granted DMD permission to use the Mark on one or two occasions in response to a specific request for permission from David Zipes ("Zipes"), an employee of DMD. (*See* Dillulio Decl. ¶ 7.) Defendants assert that Zipes never requested permission from Total Control's CEO to use the Mark (*See* Affidavit of David Zipes, dated December 7, 2005, ¶ 2.) They further contend that Raymond Dillulio, and, by extension, Total Control, knew of and consented to DMD's ongoing sale of merchandise bearing the Mark since the fall of 2003. (*See* Klein Decl. ¶ 11.) Defendants claim that "it was understood from the time that [DMD] took over the assets of Take Control that [DMD] had the right to produce and sell merchandise with the David Loren name" and that "there was never a discussion that a firm called Total Control owned a trademark to the David Loren name" because there was no registered trademark at the time that the Take Control Principals went to work for DMD. (Klein Decl. ¶ 15, 15 n. 5.) DMD understood that, because Take Control Principal Carson had been selling merchandise bearing the Mark to Ross Stores while a principal with Take Control, his continued sale of this merchandise while employed with DMD constituted continued permission for DMD to use the Mark. (*See* Klein Decl. ¶ 16.) DMD did not consider its termination of Raymond and Robert Dillulio to coincide with a rescission of consent or acquiescence in connection with DMD's use of the Mark.

## C. *THE SETTLEMENT AGREEMENT*

In May 2004, the Jeffrey Craig Companies entered into a settlement agreement with Raymond and Robert Dillulio and one Walter Tumm ("Tumm") upon the Dillulio brothers' termination from the Jeffrey Craig Companies (the "Settlement Agreement"). The Settlement Agreement does not mention use of the Mark. (*See* Settlement Agreement, attached as Exhibit D to the Klein Decl.) It purports to contain the terms of "full and complete settlement" of all claims by the Dillulio brothers, Tumm, Total Control and Take Control against the Jeffrey Craig Companies and their respective shareholders, members, officers and directors. (*See id.* ¶ 1.) The terms include payment of approximately $200,000 in consulting fees to Raymond Dillulio (although any consulting was to be provided at Raymond Dillulio's discretion), the Jeffrey Craig Companies' assumption of obligations accruing after October 1, 2003 on specified manufacturing equipment, the Jeffrey Craig Companies' turning over of files relating to Take Control and Total Control matters during the period before October 1, 2003, the agreement by the Dillulio brothers and Tumm to turn over documents in connection with Total Control accounts that had become, or were to become, Jeffrey Craig Companies accounts, and their agreement to turn over any property that came into their possession pertaining to goods sold to former Total Control and Take Control accounts by the Jeffrey Craig Companies after October 1, 2003. (*See id.*)

## D. *THE STATUS OF TOTAL CONTROL*

Total Control has provided conflicting information about its continued operations. In his Declaration of November 8, 2005, Total Control CEO Raymond Dillulio refers to "Total Control's closing in mid 2003" (Dillulio Decl. ¶ 5). In addition, a May 2004 agreement between the Creditor's Committee of Take Control, Raymond Dillulio, Lisa Interdonato, Carson, and Take Control notes that Total Control is "out of business." (Agreement dated May 2004, attached as Exhibit B to the Klein Decl.) However, in his Declaration dated December 23, 2005, Dillulio states that Total Control "is an active corporation" (Dillulio Reply Decl. ¶ 14) and that in the summer of 2005 it licensed another organization, A.J. Industries, to use the David Loren Mark (*see* Dillulio Reply Decl. ¶ 15). Furthermore, Total Control has provided an Entity Information report from the New York State Department of State Division of Corporations listing its current entity status as "active." (*See* Dillulio Reply Decl. Ex. A.)

## II. *DISCUSSION*

To prevail on a motion for a preliminary injunction, a party must "establish irreparable harm and either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor." *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002).

## A. *IRREPARABLE HARM*

"Irreparable harm is presumed in a trademark infringement action where a sufficient showing of confusion has been made." *Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N. Am., Inc.,* 270 F.Supp.2d 432, 434 (S.D.N.Y.2003) (citations omitted); *see also New Kayak Pool Corp. v. R & P Pools, Inc.,* 246 F.3d 183, 185 (2d Cir.2001). However, as discussed below, this presumption is inapplicable to the facts presented here, and Total Control fails to meet its burden of showing irreparable harm.

Defendants assert that Total Control is not entitled to the relief it seeks because (1) it unreasonably delayed pursuing any rights it had to exclusive use of the Mark, (2) it acquiesced in Defendants' use of the Mark, (3) it has abandoned the Mark, and (4) in failing to inform the Trademark Office that it had gone out of business in mid–2003, it acquired the mark fraudulently, and is now seeking equitable relief with unclean hands. These defenses will be discussed in turn.

### 1. *Unreasonable Delay*

■ The Dillulio brothers ceased working with DMD in March 2004. However, "cease and desist" letters were not sent to Defendants until late October 2005. " 'Where a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer ..., or acquiesces in the latter's use, ... a court of equity has the discretionary power ... to deny injunctive relief or an accounting.' " *Profitness Physical Therapy Ctr. v. Pro–Fit Orthopedic & Sports Physical Therapy P.C.,* 314 F.3d 62, 67 (2d Cir.2002) (alteration in original) (quoting *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 703 (2d Cir. 1970)). Specifically, the presumption of irreparable harm that would otherwise be applicable "is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." *Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 968 (2d Cir.1995).

Whether there was an unreasonable delay in Total Control's assertion of its rights in this case turns on whether Total Control knew or should have known that DMD continued to produce and sell apparel bearing the Mark after March 2004. *See Profitness,* 314 F.3d at 70 ("[A] plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew *or should have known* ... that plaintiff had a provable infringement claim against defendant." (emphasis added)).

The parties dispute whether there was such a delay here. Defendants claim that Total Control's officers knew that David Loren products continued to be sold by DMD to Ross Stores. Total Control claims that its CEO, and presumably all other officers, were unaware of DMD's continued production and sale of apparel bearing the Mark after the Dillulio brothers' departure from DMD in March 2004.

The Court finds Total Control's assertion on this point unpersuasive. Total Control asserts that it did not realize that apparel bearing the Mark was being sold at Ross Stores until it was informed of such sales by Nordstrom, another retailer with whom it does business. However, Total Control knew that DMD was selling David Loren apparel to Ross Stores when its CEO, Raymond Dillulio, worked with DMD.

Total Control also knew that Carson, a fifty-percent partner in Take Control, who sold David Loren merchandise to Ross Stores while associated with Take Control prior to the Assets Agreement, continued to sell David Loren apparel to Ross Stores while both he and Total Control's CEO worked at DMD, and that Carson stayed with DMD long after Total Control's CEO severed his employment relationship with DMD. In addition, based on the Settlement Agreement, Total Control knew that DMD would continue some of the business of Total Control and Take Control after Total Control's CEO left DMD. Thus, the Court finds that Total Control knew or should have known that DMD continued to take and fulfill orders for apparel bearing the Mark. *Cf. Christopher Norman,* 270 F.Supp.2d at 438 (finding that the parties' past joint presentation of the allegedly in-

fringing products at trade shows "undercut [plaintiff's] suggestion that it could not anticipate" defendant's continued marketing of the products at these trade shows after relationship between the parties had broken down).

Given that Total Control knew or should have known of Defendants' continued use of the Mark after it purportedly did not provide its consent for such use, its delay of approximately 19 months between the time its CEO severed his relationship with DMD in March 2004 and the time a "cease and desist" letter was sent to DMD in October 2005 rebuts the presumption of irreparable harm. Courts have found the presumption rebutted when faced with much shorter delays. *See, e.g., Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985) (finding that a 10 week delay in seeking an injunction "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury") (citation and internal quotation marks omitted); *Magnet Communications LLC v. Magnet Communications, Inc.,* No. 00 Civ. 5746, 2001 WL 1097865, at *1 (S.D.N.Y. Sept. 19, 2001) ("[A] delay of twelve weeks ... tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.") (citation and internal quotation marks omitted).

### 2. *Acquiescence and Laches*

■ Defendants assert that Total Control acquiesced in their use of the Mark. In order to prevail on a defense of acquiescence, a defendant must show that " '(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not

excusable; and (3) the delay caused the defendant undue prejudice.' " *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 294 F.3d 383, 395 (2d Cir. 2002) (quoting *SunAmerica Corp. v. Sun Life Assurance Co.,* 77 F.3d 1325, 1334 (11th Cir.1996)). "Both [acquiescence and laches] connote consent by the owner to an infringing use of his mark[;] acquiescence implies active consent, while laches implies merely a passive consent." *Profitness,* 314 F.3d at 67 (first alteration in original) (quoting *Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 462 (4th Cir.1996)). A plaintiff may be estopped by laches when its unreasonable delay in bringing the action causes prejudice to the defendant. *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 192 (2d Cir.1996). A trademark holder "communicates active consent by conduct that amounts to an explicit or implicit assurance that plaintiff, with knowledge of defendant's conduct, will not assert its trademark rights." *Profitness,* 314 F.3d at 68 (citing *Zeiss,* 433 F.2d at 704).

■ Here, Total Control's CEO worked at DMD while DMD was producing and selling apparel bearing the Mark. After leaving DMD, he entered into the Settlement Agreement, which purported to settle all claims that Total Control might assert against DMD. The Settlement Agreement did not mention rights to the Mark, though it did address the former Total Control accounts that were transferred to DMD. The Settlement Agreement is an implicit, if not an explicit, assurance that Total Control would not assert its rights to the trademark against DMD. Furthermore, as discussed above, after providing this assurance, Total Control delayed in asserting its rights, and the Court does not find its proffered excuses convincing. At the Hearing on this motion, DMD averred that Ross Stores has now returned

all inventory bearing the Mark to DMD, leaving DMD with hundreds of thousands of dollars' worth of merchandise that it may be unable to sell. Thus DMD has been prejudiced by the delay.

The Second Circuit has cautioned that "[w]hile a plaintiff may acquiesce in some uses of the mark and in any resulting likelihood of consumer confusion … a defendant may exceed the scope of the plaintiff's consent and [thereby] be exposed to liability." *Profitness*, 314 F.3d at 69. Thus, district courts must carefully evaluate the scope of acquiescence. *Id.* Here, Defendants' use fits squarely within the scope of Total Control's acquiescence. It is the same use that Total Control itself made of the Mark, and the same use that DMD made of the Mark while Total Control's CEO was working at DMD.

### 3. *Abandonment*

 To establish abandonment, a party must show "either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its significance as a mark." *Hermes Int'l v. Lederer de Paris Fifth Ave.*, 219 F.3d 104, 110 (2d Cir.2000) (citation omitted). Nonuse for three years constitutes prima facie evidence of abandonment. *See* 15 U.S.C. § 1127. Assuming that Total Control did not use the Mark from the time it ceased operations in mid–2003 until its licensee, A.J. Industries, sold merchandise bearing the Mark to a retail store in June 2005, abandonment is not shown. This nonuse does not approach the three years necessary to establish prima facie abandonment. Furthermore, although the sale of the open orders to DMD and the lack of any mention of the Mark in the Settlement Agreement may point toward an intent to abandon, Total Control's later licensing of the Mark to A.J. Industries and A.J. In-

dustries' sale of apparel bearing the Mark suggest that Total Control did not intend to abandon the Mark. Thus, any intent to abandon is at best equivocal, and the Court finds that Total Control did not abandon the Mark.

### 4. *Unclean Hands*

 A Court may deny relief based on the doctrine of unclean hands "where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith relating to the matter at issue to the detriment of the other party." *Estate of Lennon v. Screen Creations, Ltd.*, 939 F.Supp. 287, 293 (S.D.N.Y.1996) (citation and internal quotation marks omitted). "Typically, courts that have denied injunctive relief due to plaintiff's unclean hands have found plaintiff guilty of truly unconscionable and brazen behavior." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F.Supp.2d 126, 131 (S.D.N.Y.1999). Here, Defendants argue that Total Control fraudulently obtained the trademark registration because it was not in operation at the time the trademark was registered in December 2003. However, Defendants have offered no evidence that Total Control ever ceased to exist as a legal entity. Total Control, on the other hand, has provided evidence, in the form of the Entity Information report, that its legal existence continues into the present. The evidence suggests that Total Control ceased operations in mid–2003, but Defendants provide no authority to suggest that an existing entity is required to report this information in the process of applying to register a trademark. In fact, the Lanham Act provides that both natural persons and "juristic persons" may serve as trademark applicants and registrants, and defines "juristic person" as "a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law." *See* 15 U.S.C. § 1127. At

all relevant times, Total Control was an existing corporation; thus it was capable of suing and being sued in a court of law. *See* N.Y. Bus. Corp. Law § 202(a)(2) (McKinney 2005) (a New York Corporation has the power "to sue and be sued in all courts").

### 5. *Harm to Total Control's Reputation*

■ As discussed above, the presumption of irreparable harm that usually accompanies an action for trademark infringement when likelihood of confusion is established is inapplicable here. Without the benefit of the presumption, Total Control fails to meet its burden of proving irreparable harm. "To establish irreparable harm ... the moving party must demonstrate not just the mere possibility of irreparable harm, but 'that it is likely to suffer irreparable harm if equitable relief is denied.'" *Echo Design Group, Inc. v. Zino Davidoff S.A.*, 283 F.Supp.2d 963, 967–68 (S.D.N.Y.2003) (quoting *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990)).

Total Control maintains that Defendants' sales of products bearing the Mark are damaging the goodwill and reputation that it has built up in the Mark. It further claims that other retailers have complained about the sales of David Loren merchandise at Ross Stores or refused to stock David Loren merchandise while it is being sold at Ross Stores. (*See* Dillulio Reply Decl. ¶¶ 16–17.) However, Total Control makes no allegations of an actual difference in quality between the David Loren goods it produced or licensed and sold to Ross Stores prior to the Assets Agreement, and the David Loren goods produced by DMD and sold to Ross Stores. Nor does Total Control explain how continued sale of products bearing the Mark at a store to which Total Control (or its affiliate Take Control) previously market-ed and sold the product in any way devalues the Mark or has a detrimental impact on Total Control's name or goodwill. Any loss of business caused by the continued sale of products bearing the Mark at Ross Stores is compensable through a damages action, and does not represent irreparable harm.

### B. *THE RELATIONSHIP BETWEEN TOTAL CONTROL AND DMD*

It is unclear on the record before the Court at this point in the proceedings whether or not Total Control granted DMD ongoing permission to use the Mark and to sell clothing bearing the Mark to Ross Stores. Accordingly, to this extent Total Control has also failed to establish sufficiently its likelihood of success on the merits, or a balance of equities tipping decidedly in its favor. If, as Total Control asserts, DMD was a licensee of the Mark, the "cease and desist" letters put Defendants on notice that the license was being revoked. *See Profitness*, 314 F.3d at 68 ("Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts.") (quoting *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir.1998)). If, on the other hand, the relationship between Total Control and DMD was more akin to that of a joint venture, Total Control may not be entitled to injunctive relief where products bearing the Mark continue to be sold at the same store to which Total Control sold them before entering into a relationship with DMD and during the period of their joint venture. *See Christopher Norman*, 270 F.Supp.2d at 436–37. This issue should be further developed by the parties at trial or on a motion for summary judgment.

### III. *CONCLUSION AND ORDER*

For the reasons stated above, the Court concludes that the circumstances present-

ed here do not warrant the extraordinary injunctive relief Total Control seeks. Accordingly, it is hereby

**ORDERED** that the application of plaintiff Total Control Apparel, Inc. for a preliminary and permanent injunction preventing defendants DMD International Imports LLC and Ross Stores, Inc. from using the David Loren trademark is DENIED; and it is further

**ORDERED** that the parties are to submit a proposed case management plan to govern remaining pretrial proceedings by January 20, 2006; and it is further

**ORDERED** that the parties are to inform the Court at any time before January 20, 2006, whether significant progress has been made toward settlement of this matter; and it is finally

**ORDERED** that the parties are to inform the Court by January 20, 2006, whether they would consent to proceed to trial before the designated magistrate judge.

**SO ORDERED.**